No. 68,131

STATE OF KANSAS, *Appellee,* v. LENA FERGUSON, *Appellant.*

(864 P.2d 693)

Opinion filed December 10, 1993.

*Jessica R. Kunen,* chief appellate defender, argued the cause and was on the briefs for appellant.

*David B. Debenham,* assistant district attorney, argued the cause, and *Joan M. Hamilton,* district attorney, and *Robert T. Stephan,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is a direct appeal by the defendant, Lena Ferguson, from her jury convictions of one count of aggravated arson and one count of felony murder. She was sentenced to a

term of 15 years to life for aggravated arson to run concurrently with a term of life imprisonment for felony murder.

On January 13, 1991, David Summers died from smoke and heat inhalation along with some carbon monoxide asphyxiation. His body was found in the living room of his house at 3116 SE Dupont in Topeka, where there had been a fire. The autopsy showed that Summers had been alive and breathing for a few minutes while the fire was burning. Summers' chest and upper abdomen "showed no burning because the body had been laying face down in the fire."

The defendant shared the house with Summers, her former husband. In the fall of 1990, Summers became sexually involved with Margaret Matthews. Summers told Matthews that he and his former wife were roommates. Matthews testified that she called Summers at his house approximately three times a week and that sometimes the phone was answered by a woman who threatened Matthews and refused to allow her to speak with Summers.

Summers spent the night of January 12-13, 1991, with Matthews in a motel. Between 1:30 and 3:00 a.m., Matthews telephoned Ferguson several times from the motel room. First Matthews called Ferguson and asked her if she was Dave's wife; Ferguson hung up. Matthews began the second call by saying to Ferguson, "Dave wants to speak to you," and handing the telephone to him. After speaking briefly to Ferguson, Summers hung up.

At approximately 10:00 a.m. on January 13, 1991, a friend went to Ferguson's house to pick her up and take her out to breakfast. Although the friends had agreed some days earlier to eat out together on that Sunday morning, Ferguson refused to go. Neither Summers nor his car was at the house. Near the sofa there was a quilt partially covering what looked like a plastic milk container. The friend noticed it because it looked out of place in Ferguson's normally neat house.

Sometime around noon to 12:30 p.m., a passerby saw black smoke coming from the house at 3116 SE Dupont. From a nearby gasoline station, he called 911. He went back to the house and knocked and shouted to alert any occupants of the danger. He

stayed until the fire department arrived, and he did not see anyone leave the house.

Ferguson's sister testified that Ferguson arrived at her apartment at approximately 1:00 p.m. Ferguson was "very frantic." At trial the sister testified that Ferguson had said that "something was on fire" and told her to dial 911. Randy Mills, a police officer, testified that the sister had told him that Ferguson "had said something similar to . . . 'I burned the son of a bitch over there.' "

At 12:43 p.m., Ferguson showed up at the Topeka Police Department. When she entered the patrol office, she was smoking a cigarette. The officer told her no smoking was permitted in the police department. Ferguson stepped back into the lobby and put the cigarette out in an ashtray. She reentered the patrol office. When the officer at the desk asked Ferguson how he could help her, Ferguson responded, "I just killed a man. I set him on fire." He asked her where, and Ferguson said at 3116 SE Dupont. He checked the monitor and verified that a fire had been reported at that address. The desk officer telephoned for the detective on duty, and then he escorted Ferguson to the detective division.

There Officer Mills introduced himself to Ferguson. Ferguson replied in the negative when he asked her if she needed a drink of water, if she needed to use the restroom, and if she needed any medical assistance. Ferguson asked Officer Mills "if he was dead," and Mills told her that Summers was dead. Ferguson said, "Didn't mean to kill him," "Didn't want to," and "I'm tired of this," or "I'm tired of it."

In the presence of Ferguson, Mills told a female officer that Ferguson's clothing was to be confiscated and photographs were to be taken of Ferguson for the purpose of documenting any visible wounds she might have. Ferguson said, "I don't have no injuries." The female officer testified that she did not see any bruises, abrasions, or cuts on Ferguson. The officer also testified that Ferguson's clothing smelled smoky, like a house fire rather than like cigarette smoke.

An investigator from the Topeka Fire Department testified that the fire had been set. Indications of a set fire included his eyes stinging due to the presence of gasoline, a faint odor of gasoline

around the body of David Summers, and a pattern around the body where a flammable liquid had been poured and burned. A carpet sample taken from near Summers' left leg contained gasoline. A plastic milk container about half full of gasoline was found around the corner from the living room in the kitchen. The soot which had been deposited on the windows was soft, which indicates a free-burning, fast fire rather than a smoldering one. "An open flame would ignite a free burning fire," according to the investigator.

The police investigation of the house revealed some clothing outside the back door of the house. Police also found some items, including shoes, in the bathtub.

Ferguson first contends on appeal that her Sixth Amendment right to counsel and her Fourteenth Amendment right to a fair trial were violated because the district court would not permit her appointed attorney to withdraw. She asserts that she "had a viable claim of self defense." The contention is that her defense went undeveloped and unpresented due to the irreconcilable conflict between Ferguson and counsel.

Ferguson was in custody from January 13, 1991. The order appointing counsel for her was signed the following day. On March 29, counsel sought a continuance of the trial setting on the ground that Ferguson was unable, due to emotional turmoil, to discuss with counsel "details surrounding the event." On April 16, defense counsel filed a motion seeking permission to withdraw "and further for an order appointing counsel who is not employed by the Public Defender as substitute counsel." Counsel stated in the motion:

"In support of her motion the Accused shows the Court that she has no confidence in her present counsel or in any counsel who is employed by the Public Defender's office. Said conflict and absence of confidence is so serious that the attorney-client relationship is so adversely affected that there is effectively no counsel at all for the accused."

At the hearing on the motion to withdraw, counsel stated that the motion had been filed at Ferguson's request. Counsel stated:

"I have exhausted my ability to resolve and to satisfy Ms. Ferguson that I can effectively represent her. She is voicing the concern that because we are employees of the State, that we have an inherent conflict of interest— and those aren't her words, but that's the import of what she is saying—

in representing her as a defendant charged by the State. But, it goes deeper than that, and it's difficult for me or, in fact, I am unable to enlighten the Court as to what I see as the problem. I don't know. But, Ms. Ferguson, in my opinion, is sincere in her beliefs. I believe that she has been sincere in working with me to try to overcome the reservation she has. She has talked to me. She has not avoided me. She has been willing to discuss issues and problems, but there is something very basic in her feelings right now which leads me to believe that she does not have the confidence in me or my staff to permit her to put on the defense that she has. And I can represent to the Court that in my professional opinion she has a defense in this case which a jury should be allowed to decide."

Ferguson testified that at the time of the hearing she did not have money to hire a lawyer, but that she had a workers compensation claim pending from which she expected to obtain some money. She was unable to estimate when her compensation claim might be settled. In subsequent proceedings, it was never represented to the district court that Ferguson was financially able to hire counsel.

When asked about reasons why she did not want to be represented by her appointed counsel, Ferguson principally responded that a lawyer who was paid by the government could not fairly represent her, as shown by the following excerpts from her testimony:

"Q. Do you care to tell the Court in your own words why you feel that I can't be your lawyer in this case?

"A. Because I don't believe that the State—ah, the State has these charges up against me, and I don't feel like someone working for the State can help me and help me like they should help me because you can't work for the State and me too.

. . . .

"THE WITNESS: I don't feel that Mr. Wurtz can work for the State and work for me too and I get a fair deal out of this.

. . . .

"A. . . . . I don't feel like anybody that works for the State will help me the way that I should be helped.

. . . .

"A. . . . . I don't know why, but I just don't trust you and I won't trust anybody that works for the State.

"Q. You—one thing we did not talk about, but maybe we should talk about, the Judge may ask the same question, if a lawyer is appointed who is not a public defender, is not on the salary of the State, that lawyer would be paid by the State regardless. I mean, they wouldn't be employees, like

I am, but their fee, if they were appointed and I were allowed off this case, would be paid by the State.

"A. Well, then, I don't feel that I would get a fair deal.

"Q. You don't feel like you would get a fair deal then, either?

"A. No. The State is the one that's prosecuting me, and anybody that's paid by the State is going to work for the State and not for me."

Ferguson also expressed some complaints about trial counsel's handling of her case. First, she found fault with his failure to seek and obtain a bond reduction at an earlier date. Counsel filed a motion for reduction of bond on March 29. The district court judge found that there had been nothing derelict in counsel's conduct and that, in fact, in successfully advocating Ferguson's release, counsel had "achieved something that is rarely seen in Class A felony cases." Second, she complained that counsel withheld information from her. Third, Ferguson testified, "I feel like you haven't gotten in touch with a lot of people that you should." The district court judge stated that such general allegations, with no specifics and no showing, carry no weight.

Ferguson concluded her testimony as follows: "I just want to find me a lawyer that I know is going to help me, that is going to work for me and only me." The district court judge remarked that he saw no evidence that counsel had failed to work for her. At that time, counsel had filed on Ferguson's behalf the following substantive pretrial motions: to suppress statements, to suppress evidence seized from the house, to suppress evidence from her vehicle, to suppress photographs and testimony, to reduce bond, and to prohibit or limit electronic and/or photographic trial coverage.

The district court concluded that the legal standard for substitution of counsel had not been met by Ferguson. The district court stated:

"The defendant is entitled to the effective assistance of counsel. She is entitled to a competent professional to represent her. She is entitled to an experienced attorney. Mr. Wurtz meets all of these tests. He is extremely experienced. He is a well-trained professional. Certainly he has as much experience with this type of case as almost any attorney in the bar. The defendant is not entitled to an attorney of her choice, but to a competent attorney who will be able to provide her the professional assistance under constitutional standards that have been established by the courts of this land and by the Kansas courts. I have no persuasive evidence that Mr. Wurtz fails to meet the standard."

Although he denied the motion to withdraw, the district court judge left open the possibility of a change: "This does not preclude her from a timely hiring of her own attorney if this were done expeditiously and he were willing to enter his appearance. But, I'm not changing the schedule of this case at this point in time."

Trial was delayed while Ferguson was hospitalized and evaluated for competence. On October 24, Ferguson was discharged from Larned State Security Hospital (Larned).

On November 13, the district court convened a hearing on pending motions; defense counsel suggested that Ferguson's competency and substitution of counsel should be considered before the pending motions were taken up. Defense counsel told the court that he had spoken directly with his client on only one brief occasion since her release from the hospital, that other communications had been through her physician, and that Ferguson had ignored counsel's requests to visit with him in his office. Counsel stated that Ferguson "has a deep and abiding distrust of everything that I do," and that she believes that he passes her confidences on to the prosecutor. Counsel told the court, "In the present state of our relationship, as I see it, there being no relationship, I don't believe I can effectively present a defense on her behalf." Finally, counsel stated that his own frustration further diminished his effectiveness.

The district court denied the request for substitution of counsel. Noting that a hearing had been conducted earlier and that the subjective nature of Ferguson's complaints had not changed since then, the district court judge stated that a reasonable basis for permitting counsel to withdraw had not been presented. The district court found that there had been no showing that defense counsel was incompetent or that there was any ethical conflict or that he had been derelict in representation. The district court concluded that absent a showing of some reasonable basis, it would be ill-advised to permit a change of counsel because, "[i]f we do it in this case, then presumably we should do it in any serious case where the defendant asserts that they are not pleased for a number of subjective reasons with the attorney."

The district court then took up the pending motions. After the testimony of one witness, defense counsel informed the court that

Ferguson wished to be excused. On the record in chambers, Ferguson told the district court judge that she did "not wish to hear the lies two or three times, once will be enough for me." Defense counsel renewed his motion to withdraw in light of her request. He stated that "[t]his is further demonstration . . . of the fact that our relationship is such that she cannot help me." In denying the renewed request, the district court stated that in addition to reasons already given,

"there is no showing or reason to believe that any other attorney would be in a better position to work or cooperate with the defendant, and the Court remains unpersuaded that this would cure any problem that we might have in the future, and there is no reason for the Court to believe that any other attorney would have any better cooperation from this—from the defendant."

On November 18, the first day of trial, defense counsel filed another motion to withdraw as counsel. The request was denied, and the case proceeded to trial. No testimony was presented on behalf of Ferguson.

In *State v. Banks*, 216 Kan. 390, Syl. ¶ 2, 532 P.2d 1058 (1975), the court stated: "As a general rule whether the dissatisfaction of an indigent accused with his court-appointed counsel warrants discharge of that counsel and appointment of new counsel is for the trial court, in its discretion, to decide." In *State v. Saeger*, 13 Kan. App. 2d 723, 724, 779 P.2d 37 (1989), where the district court had refused the indigent defendant's request to discharge counsel, the Court of Appeals stated:

"On appeal, our scope of review is limited to whether the trial court abused its discretion. In making that determination, we must decide whether any reasonable person would agree with the trial court's ruling. If we can reach that conclusion, we will not disturb the trial court's decision. *Hoffman v. Haug*, 242 Kan. 867, 873, 752 P.2d 124 (1988)."

*Banks* is the only decision of this court which is cited by Ferguson on the issue of substitution of counsel. Immediately before Banks' trial began, his counsel requested permission to withdraw on the ground that there was a conflict between his duties to his client and to the court and that Banks "wanted the case tried in a different manner than counsel felt the case could be tried." 216 Kan. at 391. Counsel stated that any attorney would confront the same conflict in representing Banks. 216 Kan. at 391. The district court denied the request for lack of timeliness

and on the ground that "the same situation would arise with any other member of the bar." 216 Kan. at 391. Then Banks revealed to the district court judge that counsel had refused to use a certain witness and had explained to Banks that using the witness would conflict with the attorney's duty as an officer of the court. 216 Kan. at 391.

During the trial, Banks engaged in several episodes of disruptive behavior, was adjudged in contempt, and was gagged for a period of time. At the close of the State's evidence, defense counsel announced that Banks would present no evidence, and Banks remarked to the jurors that he had evidence which he was not being allowed to present. Banks was removed from the courtroom, and the trial proceeded without him. Banks was acquitted of one charge and found guilty of another. 216 Kan. at 392.

The basic standard stated by this court in *Banks* is as follows:

"As long as the trial court has a reasonable basis for believing the attorney-client relation has not deteriorated to a point where appointed counsel can no longer give effective aid in the fair presentation of a defense, the court is justified in refusing to appoint new counsel (*State v. Henderson*, 205 Kan. 231, 468 P.2d 136)." 216 Kan. at 394.

Although the district court had been advised that any other attorney likely would encounter the same problems, that was not a primary factor in consideration. This court affirmed the trial court's denial of Banks' request for a different attorney.

In *Saeger*, the Court of Appeals relied on *United States v. Gallop*, 838 F.2d 105, 108 (4th Cir.), *cert. denied* 487 U.S. 1211 (1988), for its analytic framework. 13 Kan. App. 2d at 724. The federal appellate court considered the following factors in determining whether the trial court had abused its discretion in denying a request for substitution of defense counsel: "timeliness of the motion, adequacy of the trial court's inquiry into defendant's complaint, and whether the attorney-client conflict was so great that it resulted in total lack of communication preventing an adequate defense." 13 Kan. App. 2d at 724. Ferguson structures her argument on this framework, citing *Smith v. Lockhart*, 923 F.2d 1314, 1320 (8th Cir. 1991), and *U. S. v. Walker*, 915 F.2d 480, 482-83 (9th Cir. 1990), for authority.

Ferguson contends that her relation with trial counsel had deteriorated to the point where he could not give effective aid in

the fair presentation of her defense. She argues that their relation was marked by a total lack of communication which prevented presentation of any defense. She cites *Saeger* for the proposition that substitution of counsel is required where there has been a total breakdown of communication, but in that case "there was no breakdown of communication." 13 Kan. App. 2d at 727. In *Saeger*, the district court's denial of the request to discharge the court-appointed attorney was affirmed by the Court of Appeals.

The lack of cooperation or communication between defendant and trial counsel does not in and of itself constitute a violation of the Sixth Amendment right to counsel. In the recent case of *State v. Cromwell*, 253 Kan 495, 500, 856 P.2d 1299 (1993), the failure to appoint substitute counsel was raised on appeal, and we said: "Irreconcilable conflict between a defendant and his attorney may, under certain circumstances, require the appointment of substitute counsel in order to protect a defendant's Sixth Amendment right to effective assistance of counsel." We concluded:

"Although there was a substantial break in communication between defendant and his counsel, which, if not addressed, might have resulted in an irreconcilable conflict, the court restored communication between defense counsel and client, making it unnecessary to appoint substitute counsel. The defendant and his counsel took advantage of the three-week continuance to communicate with one another, and communication continued throughout all proceedings. Under these circumstances, we conclude that the trial court did not abuse its discretion in refusing to appoint substitute counsel." 253 Kan. at 504.

Here, Ferguson contends that there was a total breakdown in communication which prevented counsel from presenting a defense and that the district court ignored the signs and its duty to inquire. The signs, according to Ferguson, were counsel's statements that there was a "viable defense which he could not ethically reveal," that Dr. Parks knew why Ferguson distrusted counsel, and that counsel was too frustrated to zealously represent her. The record does not contain a statement of counsel to the district court that Ferguson had a viable defense which he was constrained from revealing. At the April hearing, trial counsel stated, "I can represent to the Court that in my professional opinion she has a defense in this case which a jury should be

allowed to decide." If this is the statement to which Ferguson refers, she has invested it with meaning somewhat beyond its words. Counsel's statement with regard to Dr. Parks was made on November 13 and is as follows:

"[T]he fact of payment of counsel, only she can answer whether that makes a difference to her, and the Court may obviously inquire. But, that is not what I have found to be an overriding concern in her expressions of discontent with me. And it has similarly not been that which has been conveyed to me in a very limited sense by her psychiatrist. He is protected by privilege too, and so I don't believe he has been able to be completely frank with me either. But the sense I get is deeper than simply who is paying the bill."

Ferguson contends that the proper focus of the district court's inquiry should have been on the *conflict* between defendant and counsel, and not whether counsel was legally *competent*. In the present case, the district court judge considered the competence of counsel, and it is apparent from his remarks that counsel's competence weighed against granting the request for change. It does not appear, however, that the district court judge's first concern was counsel's competence. At the April hearing, he turned his attention to competence *after* Ferguson testified that she did not believe that she could be fairly represented by any attorney who was paid by the State. From her testimony, the judge concluded that the same conflict would arise with any appointed attorney. Then he considered whether there was any reason other than the conflict between defendant and counsel which would warrant substitution, and that is when he considered competence.

By the time requests for substitution were made in November, the district court judge had received the suggestion of staff at Larned that a change of counsel "may help the situation." Ferguson complained to Larned staff that trial counsel " 'did not do his job properly,' " and she stated: " 'Why should I trust him; I will never say anything to him; I should have been here in January, not August. He is not working in my best interest.' " The staff concluded that Ferguson's

"expressed unwillingness to cooperate with the attorney appears to be related to her strong feelings of being let down by him because he never contacted her and was not working in her best interest while she was in jail. There

are no strong indications to suggest that her mental illness is the basis for her lack of trust in her attorney."

The district court judge who received this recommendation, unlike the staff members who made it, was aware that Ferguson's complaints of her counsel's lack of diligence were not supported by the facts. He knew that Ferguson's bond had been reduced and she had been released from jail. With regard to her complaint that her competency evaluation should have occurred at an earlier time, the district court knew that her personal psychiatrist, Dr. Parks, testified on May 1 that she understood the nature and purpose of the legal proceeding against her and that, with (his) treatment for a month or two, she would be able to assist in her defense. The district judge knew that Dr. Parks had testified in May that Ferguson had a "suspicious distrust almost at a paranoid level which makes it difficult for her to cooperate with anyone *at this point*." (Emphasis added.)

The Larned report from October is replete with indications that Ferguson's distrust and unwillingness to cooperate had not abated in the intervening months. The report notes that Ferguson "consistently refused" to provide information about her medical history, she refused to sign releases for her medical records, she refused to cooperate with formal evaluation procedures, she refused psychological testing, and she told her sister not to complete a background information questionnaire. The report states: "Her overall behavior may be characterized as uncooperative, suspicious, belligerent, hostile and defiant."

It may be noted that Ferguson's reluctance to cooperate extended to her post-trial proceedings. Her presentence investigation report contains the following: "After introducing myself and informing her that I was conducting a presentence investigation for the Court, Ms. Ferguson stated she didn't want to participate in the interview." Her evaluation and classification report from the Department of Corrections contains the following: "As previously indicated the inmate did not wish to participate in the evaluation process however did not formally decline to be evaluated."

A review of the record in this case leaves little doubt that the breakdown in communication between Ferguson and counsel was absolute. The State's response is that "lack of communication

between a defendant and defense counsel due to a defendant's refusal to cooperate is not of itself basis for reversal on grounds of ineffective assistance of counsel." The State relies on *Thomas v. State*, 421 So. 2d 160 (Fla. 1982), and *State v. Long*, 206 Mont. 40, 669 P.2d 1068 (1983). We agree.

Long was convicted of arson of a trailer. His "automobile was seen by witnesses at the trailer immediately before the blast and speeding away immediately after." 206 Mont. at 42.

When Long complained that his first court-appointed attorney was not adequately representing him, the trial court substituted counsel. 206 Mont. at 42-43. At the initial interview with his new counsel, Long refused to cooperate, tried to overturn the table, and stalked out of the room. 206 Mont. at 43. Long's second request for substitution of counsel was refused. He refused to cooperate in preparation of the defense, and no defense witnesses were called.

In evaluating Long's arguments that he had been denied effective assistance of counsel, the Montana Supreme Court viewed Long as the source of the problem he complained of. It cited the general rule that " 'a party who participates in or contributes to an error cannot complain of it.' " 206 Mont. at 48.

With regard to appointed counsel's performance, the Montana court stated: "The record shows that defendant received not only adequate, but diligent and conscientious representation. This representation included filing of various motions with supporting memoranda, questioning the State's witnesses before and during trial and sentencing, pre-trial investigation, numerous interviews with defendant and meetings with the prosecutor." 206 Mont. at 47.

Stating that "we will not allow the defendant to complain of problems caused by his refusal to cooperate with defense counsel," the Montana court held: "[T]he lack of communication between defendant and Houtz did not deny defendant effective assistance of counsel. The record clearly shows that defendant received effective assistance of counsel. Moreover, any lack of communication between Houtz and defendant was caused by defendant's refusal to assist in his own defense." 206 Mont. at 48.

In the other case cited by the State, Thomas was under a sentence of death in the state of Florida. Among the many issues

which he raised before that state's Supreme Court was ineffec-
tiveness of counsel due to the trial court's denial of defense
counsel's motion to withdraw. 421 So. 2d at 163-64. Among the
reasons the Supreme Court gave for denying relief is the follow-
ing:

"At the hearing in the court below it was established that the difficulty
between appellant and his lawyer was due to appellant's refusal to com-
municate with the lawyer. The court ruled that this constitutes no ground
for holding that there was a denial of effective assistance of counsel. . . . A
defendant must not be allowed to refuse to cooperate with his attorney and
then attempt to create an issue of ineffective counsel on the basis of his
refusal to cooperate." 421 So. 2d at 164.

Ferguson would distinguish *Long* on the ground that it was
Long's second, rather than first, request for substitution which
was denied. She would distinguish *Thomas* on the ground that
another reason why the Florida Supreme Court denied relief was
"that it was not ineffective assistant [*sic*] of appellate counsel to
fail to raise a substitution of counsel issue on appeal." There were
several distinctive aspects to the procedurally complex *Thomas*
case. It appears that Ferguson has focused on a claim made in
a petition for writ of habeas corpus that appellate counsel was
ineffective, while the State referred to Thomas' claim that his
trial counsel was ineffective.

We find the *Long* and *Thomas* decisions are applicable to the
present case. *Long* is particularly instructive. Arguably, the trial
judge could have appointed substitute counsel for Ferguson, as
was done in *Long*. However, based upon Ferguson's testimony
to the court, appointment of substitute counsel would have been
an exercise in futility. The court had no viable option other than
to appoint counsel paid by the State. There is no reason to believe
such a substitute counsel would fare any better than trial counsel
did. That is one of the lessons to be learned from *Long*.

Counsel indicated that he had only one brief communication
with Ferguson after she was released from Larned. During that
time, she was free to contact counsel and cooperate with him in
preparing her defense. She refused to do so. The record is replete
with her failure to cooperate with anyone relative to this case.
There was no showing that the representation by counsel was
ineffective or that his continued representation would impair Fer-

guson's right to counsel. The record supports the finding by the district judge that there was no basis on which to appoint substitute counsel for Ferguson. She refused to cooperate with her counsel and caused or substantially contributed to the problems of which she now complains. She cannot now complain of a trial error which was of her own making. We conclude that the conflict was due to her refusal to communicate or cooperate with her counsel; therefore, her right to counsel was not violated.

Next, we consider if the district court erred in finding Ferguson competent to stand trial. On appeal, this court's inquiry on the issue of Ferguson's competency to stand trial "is limited to whether the trial court's finding of competency amounted to an abuse of discretion." *State v. William*, 248 Kan. 389, 415, 807 P.2d 1292, *cert. denied* 116 L. Ed. 2d 89 (1991).

K.S.A. 22-3301(1) provides:

"(1) For the purpose of this article, a person is 'incompetent to stand trial' when he is charged with a crime and, because of mental illness or defect is unable:

(a) To understand the nature and purpose of the proceedings against him; or

(b) to make or assist in making his defense."

Ferguson contends that she was unable to assist in making her defense. The State does not dispute that Ferguson did not aid in making her defense, but the State argues that she was unwilling to cooperate rather than unable due to mental illness to assist. We agree.

On May 1, at a hearing on Ferguson's motion to continue trial, Dr. Parks testified that Ferguson was under his care at Stormont-Vail Regional Medical Center. Dr. Parks testified that she was beginning to respond to medication and was improving, "but remains severely ill and really significantly depressed." He testified unhesitatingly that Ferguson understood the nature and purpose of the legal proceeding against her. His response to the question whether she could assist in making her defense was that at that time she could not, but he believed she would be able to assist once she had been treated. Dr. Parks stated:

"Ah, that one *right now*, she has trouble with that. She's not functioning well enough to assist. There is another element of her illness that I have learned more so since I have gotten to know her better is her suspicious

distrust almost at a paranoid level which makes it difficult for her to cooperate with anyone *at this point*. And there is another element to her which appears she may be a person that has received trauma psychologically or physically over a long period of time which makes her shut off and noncommunicative about a lot of things. So, she will have difficulty *right at this moment* really assisting. If treated, I think she would be able to cooperate, but she would have extreme difficulty *at this point* psychologically thinking quick enough, fast enough, clear enough to assist." (Emphasis added.)

When asked how long it would be before she was able to assist in making her defense, Dr. Parks estimated 30 to 60 days.

On July 29, the district court conducted a hearing on Ferguson's motion to determine competency. The district court ordered that Ferguson be examined by Dr. James B. Horne. The record contains a report of the mental examination of Ferguson which took place on July 30. The following is the concluding paragraph of the report:

"There was no apparent distortion of thinking except for very fixed beliefs that [her appointed attorney] is not acting in her interest. These were not a minimal [*sic*] to any kind of rational challenge and were quite fixed beliefs on the order of a paranoid delusion. When it touches her own interests, she does seem to have a paranoid stance that there is no reason that what she wants or needs cannot be. If she is told she cannot have it as she cannot have the medication unless she submits to a blood test or if she can't afford an attorney she will have to use an appointed one, if this does not suit her, she feels free to refuse what she can have. This is symptomatic of mental illness and, since it wipes out her ability to cooperate with her attorney, tends to make her 'incompetent' in the sense of being unable to cooperate with her attorney in her own defense."

Upon consideration of Dr. Horne's report, the district court ordered Ferguson to be committed to Larned for examination.

In mid-October, the staff of Larned produced its report. Those observations concerning Ferguson's uncooperativeness were set out earlier in this opinion in discussion of the question of substitution of counsel. The staff characterized Ferguson's behavior as "uncooperative, suspicious, belligerent, hostile and defiant." It concluded:

"Ms. Ferguson is competent to stand trial in that she understands the nature and purpose of the proceedings against her, and is able to assist her attorney in making her defense. Her expressed unwillingness to cooperate with the attorney appears to be related to her strong feelings of being let down by him because he never contacted her and was not working in her best interest while she was in jail. There are no strong indications to suggest that her

mental illness is the basis for her lack of trust in her attorney. Therefore, her choice to refuse to cooperate, of and by itself, is not considered by the staff to be a sign of incompetency to stand trial. In view of this and her overall level of intellectual, emotional and social functioning, Ms. Ferguson is considered to be competent to stand trial."

On November 13, the district court accepted the conclusion of the Larned staff and adjudged Ferguson to be competent to stand trial.

Ferguson's challenge to the district court's determination of her competence hinges on Dr. Parks' speculation during the May hearing that "she may be a person that has received trauma psychologically or physically over a long period of time." Ferguson's theory of incompetence is that she suffers from post-traumatic stress disorder which renders her unable to discuss the stressful events or trauma. It is for this reason, she contends, she was unable, not merely unwilling, to communicate with her attorney. Being unable to talk with her attorney about significant events, she was unable to assist in making her defense.

At the time Dr. Parks testified, he had been treating Ferguson only a few days and she was only beginning to tell him about herself. The record does not contain any follow-up on this question with Dr. Parks at a time when he was more familiar with Ferguson's background. Neither of the subsequent reports of professional evaluations of Ferguson's mental state contains support for Dr. Parks' suggestion of long-term trauma.

Ferguson notes that in the recent case of *State v. William*, 248 Kan. 389, this court affirmed the district court's determination that an obviously troubled man was competent to stand trial. She would distinguish *William* from the present case on the ground that her potential defense was never presented due to her inability to communicate with counsel, whereas William's defense of insanity was presented. We do not find the distinction relevant and find the district court did not abuse its discretion in finding Ferguson competent to stand trial.

Ferguson next contends that the district court should have instructed the jury on lesser included offenses of felony murder and aggravated arson.

K.S.A. 21-3107(3) provides in pertinent part:

"In cases where the crime charged may include some lesser crime, it is the duty of the trial court to instruct the jury, not only as to the crime charged but as to all lesser crimes of which the accused might be found guilty under the information or indictment and upon the evidence adduced."

The court has made the following statement of the rule:

"A trial court has an affirmative duty to instruct the jury on all lesser included offenses established by the evidence. An instruction on a lesser included offense must be given even though the evidence supporting the lesser offense may not be strong or extensive. However, the instruction need not be given if there is no evidence by which a rational factfinder might find the defendant guilty beyond a reasonable doubt of the lesser included offense." *State v. Stallings*, 246 Kan. 642, Syl. ¶ 3, 792 P.2d 1013 (1990).

There is an exception to the principle stated in *Stallings*:

"The general rule for giving lesser included offense instructions is not followed in the case of felony murder. In felony-murder cases the trial court is not required to instruct on all lesser included offenses. *State v. Chism*, 243 Kan. 484, 487, 759 P.2d 105 (1988); *State v. Rueckert*, 221 Kan. 727, 731, 561 P.2d 850 (1977). If the undisputed evidence is not weak or inconclusive, but instead would convince a reasonable person that a felony had been committed, instructions on lesser included offenses are not required. *State v. Chism*, 243 Kan. at 487; *State v. Marks*, 226 Kan. 704, 713, 602 P.2d 1344 (1979)." *State v. Hobbs*, 248 Kan. 342, 347, 807 P.2d 120 (1991).

It is Ferguson's contention that the proof of the underlying felony, aggravated arson, was weak. She contends that the evidence suggests that the fire was accidentally started. Ferguson points to the absence of any proof of what ignited the gasoline. She suggests that the gasoline may have been spilled accidentally and that the furnace, gas stove, or some electrical problem ignited it. Ferguson correctly notes that the State's evidence did not rule out any and all possible alternative explanations of the fire and death of Summers, but that is not the same as saying that the evidence was weak or inconclusive.

She contends that a Texas conviction on nearly identical facts was overturned for insufficient evidence. The case relied on by Ferguson is *Massey v. State*, 154 Tex. Crim. 263, 226 S.W.2d 856 (1950). Massey was convicted by a jury of the willful burning of a building. On the following facts, the appellate court reversed

the judgment on the ground that the evidence was insufficient to support the conviction.

Massey ran an unsuccessful cafe in the burned building. There was testimony which placed him at the building shortly before the fire was discovered, and there was other testimony which placed him elsewhere. In any event, there was direct evidence of motive and opportunity. The State's evidence that the fire was of incendiary origin, however, was "entirely circumstantial, resting upon an inference based upon an inference." 154 Tex. Crim. at 270. According to the Texas court, "This may not be done. [Citation omitted.] Presumptions of fact are not indulged against an accused." 154 Tex. Crim. at 270. The first inference was that flammable liquid had been poured on the floor; the second was that "such showed an incendiary or wilful burning of the building." 154 Tex. Crim. at 270.

The State's evidence that flammable liquid had been poured on the floor was assailed by the court. The State's case depended on the testimony of an insurance agent who had not visited the site until 18 days after the fire. The court expressed doubt about his qualification to offer expert testimony and doubt about his unexplained and incorrect terminology. 154 Tex. Crim. at 265-67. The court noted that the evidence was undisputed that the fire originated in the kitchen rather than in the part of the building where the witness reportedly observed marks from flammable liquid having been poured on the floor. 154 Tex. Crim. at 269. The court noted the absence of any evidence "showing that at the time of the fire any person detected, by smell or otherwise, that any inflammable fluid had been used in the building or that portion where the fire originated." 154 Tex. Crim. at 269. Furthermore, the court noted that there was no evidence that the structure was in the same condition immediately after the fire and 18 days later. 154 Tex. Crim. at 269.

In arguing that the present case is "nearly identical" to *Massey*, Ferguson completely ignores the shortcomings in Texas' proof which were not present in the State's case against her. She focuses on what she characterizes as the absence of evidence in both cases "that the defendant intentionally set the fire." There was no direct eyewitness testimony that Ferguson intentionally set the fire, but there was evidence of a plastic milk container's being

out of place in her generally neat living room before Summers' return and evidence that after the fire it was found in the kitchen partially full of gasoline. There was testimony of several fire inspectors, whose qualifications have not been questioned, that the smell of gasoline was detected and that the appearance of the interior of the house was consistent with a flammable liquid having been ignited around Summers' body. There were the statements of the defendant following the incident to the police and others.

Ferguson's arguments that the evidence of aggravated arson is weak and inconclusive are not persuasive.

Finally, Ferguson argues that the district court was required to instruct the jury on arson because it is as plausible that the fire started before as after Summers arrived home. Here is what Ferguson would have the court infer from the evidence:

"David came home and may have entered the house after the fire was started and tried to save some of his possessions, as is evidenced by the presence of his trophies in the bathtub. Lena's statement to the police that she set the house on fire and killed a man are not inconsistent with this theory; he may have come home during the beginning of the fire."

With regard to the items in the bathtub, Officer Shannon viewed a photograph and testified that there were some shoes and some other things, "looks like it might be photographs or something." It appears that Ferguson wants the court to believe that Summers was trying to protect his prized possessions by placing them in the tub. She has not supplied the court with a reference to the record where the items in the tub are identified as "trophies." Even more troublesome for Ferguson's theory, it seems, are her own statements to the police and the evidence which strongly suggests that Summers was lying face down on the living room floor when gasoline was poured on and around him. Thus, not only is there no basis in the record which has been brought to the court's attention for Ferguson's hypothesized chain of events, but there also is potent evidence which contradicts it.

As the court stated in *State v. Garcia*, 233 Kan. 589, 610, 664 P.2d 1343 (1983), "[t]he test for the giving of a lesser included instruction is not whether any theory arises under which a person could be found guilty or innocent, but whether there is sufficient evidence to support the giving of an instruction of the lesser

charge." Because there was no evidence by which a rational factfinder might have found Ferguson guilty beyond a reasonable doubt of arson, there was no need for the district court to instruct the jury on the offense.

We next consider if the evidence was sufficient to support the convictions of felony murder and aggravated arson. As this court has stated many times:

"If the sufficiency of evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Grissom*, 251 Kan. 851, Syl. ¶ 4, 840 P.2d 1142 (1992).

Ferguson again relies on the Texas case, *Massey*. She contends that, like Texas courts, Kansas courts do not permit inferences based upon inferences to establish guilt. In this regard, she cites *State v. William*, 248 Kan. at 402. Examination of the *William* opinion at that page, however, does not reveal support for Ferguson's position. In *William*, the court stated: "A conviction can be based on circumstantial evidence, and intent as an element of a crime may be shown by acts, circumstances, and inferences reasonably deductible therefrom." 248 Kan. at 402.

More recently, the Court of Appeals reversed the convictions of Jorge Cruz and Juan Tomas De La Cruz, in part, because the jury had been allowed to speculate on unjustifiable inferences. *State v. Cruz*, 15 Kan. App. 2d 476, 490, 809 P.2d 1233, *rev. denied* 249 Kan. 777 (1991). The Court of Appeals stated that the convictions rested on "an inference of unlawful behavior . . . contradictorily drawn from direct evidence of lawful behavior." 15 Kan. App. 2d at 492. In explaining its decision, the Court of Appeals stated: "To sustain the convictions we must condone inferences upon inferences upon inferences. This we will not do." 15 Kan. App. 2d at 492.

We find no merit in Ferguson's argument. Reasonable inferences drawn from established facts and conditions justify the convictions in the present case; inferences drawn from imagined or assumed facts and conditions are not necessary.

Ferguson also argues that "an uncorroborated confession cannot serve as sufficient evidence of guilt." She quotes from 5 Am. Jur. 2d, Arson and Related Offenses § 56, p. 846: " '[W]here there

is no evidence aside from the admission or confession tending to show that there was a burning and that the fire was of incendiary origin, the extrajudicial confession or admission is not admissible in evidence.' " We do not find that either Ferguson's argument or the sources she cites have any application in the present case. Ferguson's statements to police are corroborated by substantial evidence. There was evidence of a partially concealed plastic milk container lying on the living room floor in the house, of the container being found after the fire in the kitchen half full of gasoline, of the smell of a flammable liquid, of the physical evidence of a flammable liquid having been poured around Summers' body, and of the soot which coated the interior of the living room being of a type produced by ignition of a flammable liquid.

Ferguson next contends that the admission into evidence of several statements she made to Officer Mills violated her Fifth Amendment right against self-incrimination. She complains of the admission of her comments in response to Mills' telling her that Summers was dead: "Didn't mean to kill him." "Didn't want to." "I'm tired of this," or, "I'm tired of it." She states that these comments were made during a custodial interrogation and before she had been advised of her *Miranda* rights. She also complains of the admission of her statement, "I don't have no injuries." According to Ferguson, it was made after she had been advised of her *Miranda* rights and had invoked her right to remain silent. She contends that the statement was an involuntary response to Mills' threat to have her strip-searched. Ferguson also mentions that she told Mills that she had drunk a six-pack of beer but did not feel intoxicated. It appears that she also may be complaining of the admission of this statement. It was made when Mills stated that she would be given a breath test, before the *Miranda* warnings were read.

The standard of this court's review has been stated as follows:

"When a trial court conducts a full pretrial hearing on the admissibility of an extrajudicial statement by an accused, determines the statement was freely, voluntarily and intelligently given and admits the statement into evidence at the trial, this court on appeal should accept that determination if it is supported by substantial competent evidence." *State v. Jones,* 222 Kan. 56, Syl. ¶ 6, 563 P.2d 1021 (1977).

The district court concluded that Ferguson's statements

84

"were not made while subject to interrogation and are therefore not rendered inadmissible under *Miranda v. Arizona*, 384 U.S. 436.

". . . Rather, the statements made by defendant were in response to routine words and actions in processing the defendant which are normally attendant to arrests and custody as per *Rhode Island v. Innis*[, 446 U.S. 291, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980),] and *State v. Taylor*[, 231 Kan. 171, 173, 642 P.2d 989 (1982)]."

There is no question that Ferguson was in custody at the police station. Although she appeared there of her own volition, once she declared that she had killed a man by setting him on fire, she was not free to leave. Any interrogation which took place at the police station would be custodial. The question is whether she volunteered her statements or whether they were the result of interrogation.

In support of its position that Ferguson's statements were voluntary and spontaneous and not the product of interrogation, the State cites *Jones*, 222 Kan. at 60. Jones and James Miller were placed in a line-up after they were arrested. After the line-up, Jones initiated an exchange with a police officer by asking if either he or Miller had been identified. When the officer answered, " 'Yes,' " Jones stated, " 'Miller wasn't with me on the robbery.' " 222 Kan. at 60. This court upheld the district court's admission of the statement on the ground that there was substantial competent evidence that "[t]he statement was not the product of an interrogation, but resulted from a conversation initiated by defendant." 222 Kan. at 60. The court added that "[o]n many occasions" it

"has stated that statements which are voluntary and spontaneous, and not the result of interrogation, are admissible. (*State v. Andrews*, 218 Kan. 156, 542 P.2d 325; *State v. Griffin*, 217 Kan. 703, 538 P.2d 720; *State v. Wilson*, 215 Kan. 28, 523 P.2d 337; *State v. Miles*, 213 Kan. 245, 515 P.2d 742; *State v. Nirschl*, 208 Kan. 111, 490 P.2d 917.)" 222 Kan. at 60.

In the present case, Officer Mills prepared for what he anticipated might be a lengthy questioning by asking Ferguson if she needed a drink or medical assistance or if she needed to use the restroom. He also told her that a breath test would be performed to make certain that intoxication would not interfere with her understanding what was occurring and what she was being asked. Then Ferguson asked the officer "if he was dead." Mills answered,

"[Y]es," and Ferguson responded, "Didn't mean to kill him," and so forth.

Ferguson points to Mills' writing her statements on his hand. It appears that she construes his action as an indication that she was being interrogated. Mills' having no paper on which to write may as readily be interpreted as showing that the interrogation had not yet begun and that he was not prepared for Ferguson to make any substantive statements. Further, as the State notes, Ferguson's statement was not made in response to any question or comment directed to her.

In *State v. McBroom*, 252 Kan. 376, 382, 845 P.2d 654 (1993), this court reiterated that the voluntariness of a statement should be determined on the basis of the totality of the surrounding circumstances. "If the accused was deprived of his or her free will, the statement should be considered involuntary." 252 Kan. at 382.

Ferguson's various statements were not the result of interrogation, and they appear to be more voluntary than involuntary and more spontaneous than not. Even if we were to determine that it was error to admit the statements, the question becomes whether it was reversible error.

In *State v. Peltier*, 249 Kan. 415, 426, 819 P.2d 628 (1991), the rule was stated as follows:

"Errors that do not affirmatively cause prejudice to the substantial rights of a complaining party do not require reversal when substantial justice has been done. *State v. Bell*, 239 Kan. 229, 235, 718 P.2d 628 (1986). An error of constitutional magnitude cannot be held to be harmless unless the appellate court can declare beyond a reasonable doubt that the error had little, if any, likelihood of changing the results of the trial. *State v. White*, 246 Kan. 28, 37, 785 P.2d 950 (1990)."

In *State v. Lucas*, 243 Kan. 462, 759 P.2d 90 (1988), *aff'd on rehearing* 244 Kan. 193, 767 P.2d 1308 (1989), the defendant was convicted of child abuse and felony murder. A videotaped interview of the defendant taken some three hours after he reported the child's death was admitted into evidence. The defendant was not given the *Miranda* warning until the interview was concluded. The court concluded: "[I]t was error to admit the videotaped interview in this case, but that it was harmless error as we are

satisfied that its exclusion would not have altered any of the three jury verdicts herein." 243 Kan. at 476.

In the present case, the remark made by Ferguson upon entering the police station, "I just killed a man. I set him on fire," was much more inculpatory than any of the remarks about which she complains. Following in the wake of her admittedly admissible statement, we can declare beyond a reasonable doubt that the other remarks would not have altered or changed the result of the trial.

The judgment of the district court is affirmed.