Lena B. FERGUSON, Petitioner,

v.

**Richard KOERNER, Warden, and Carla Stovall, Attorney General, Respondents.**

No. 95–3323–DES.

United States District Court, D. Kansas.

Feb. 22, 2001.

David J. Gottlieb, Jean K. Gilles Phillips, Kay Huff, University of Kansas School of Law, Lawrence, KS, for Petitioner.

Jared S. Maag, Kristafer R. Ailslieger, Office of Atty. General, Topeka, KS, Kevin C. Fletcher, U.S. Atty's Office, Sioux City, IA, for Respondents.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter comes before the court on review of Magistrate Judge Walter's Report and Recommendation (Doc. 78) on a petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. Respondents have filed objections to the Report and Recommendation (Doc. 79). For the following reasons, the court accepts and adopts the findings and conclusions of the Report and Recommendation.

## I. BACKGROUND

### A. Conviction and Direct Appeal

In November of 1991, petitioner was convicted of aggravated arson and felony murder of her ex-husband. She was sentenced to a term of fifteen years to life for aggravated arson and a concurrent term of life imprisonment for the felony murder.

Petitioner raised each of the issues presented herein within her direct appeal. Her conviction was affirmed. The facts, as found by the Kansas Supreme Court, are set forth in part below:

> At 12:43 p.m. [on January 13, 1991], Ferguson showed up at the Topeka Police Department.... When the officer at the desk asked Ferguson how he could help her, Ferguson responded, "I just killed a man. I set him on fire." He asked her where, and Ferguson said at 3116 SE Dupont. He checked the monitor and verified that a fire had been reported at that address. The desk officer telephoned for the detective on duty, and then he escorted Ferguson to the detective division.
>
> There Officer Mills introduced himself to Ferguson. Ferguson replied in the negative when he asked her if she needed a drink of water, if she needed to use the restroom, and if she needed any medical assistance. Ferguson asked Officer Mills "if he was dead," and Mills told her that [her ex-husband] was dead. Ferguson said, "Didn't mean to kill him," "Didn't want to," and "I'm tired of this," or "I'm tired of it."
>
> . . . .
>
> ... [Ron Wurtz, an attorney with the Public Defender's Office, was appointed to represent Ferguson on January 14, 1991]. On March 29, counsel sought a continuance of the trial setting on the ground that Ferguson was unable, due

to emotional turmoil, to discuss with counsel "details surrounding the event." On April 16, defense counsel filed a motion seeking permission to withdraw "and further for an order appointing counsel who is not employed by the Public Defender as substitute counsel." Counsel stated in the motion:

In support of her motion the Accused shows the Court that she has no confidence in her present counsel or in any counsel who is employed by the Public Defender's Office. Said conflict and absence of confidence is so serious that the attorney-client relationship is so adversely affected that there is effectively no counsel at all for the Accused.

At the hearing on the motion to withdraw, counsel stated that the motion had been filed at Ferguson's request. Counsel stated:

I have exhausted my ability to resolve and to satisfy Ms. Ferguson that I can effectively represent her. She is voicing the concern that because we are employees of the State, that we have an inherent conflict of interest—and those aren't her words, but that's the import of what she is saying—in representing her as a defendant charged by the State. But, it goes deeper than that, and it's difficult for me or, in fact, I am unable to enlighten the Court as to what I see as the problem. I don't know. But, Ms. Ferguson, in my opinion, is sincere in her beliefs. I believe that she has been sincere in working with me to try to overcome the reservation she has. She has talked to me. She has not avoided me. She has been willing to discuss issues and problems, but there is something very basic in her feelings right now which leads me to believe that she does not have the confidence in me or my staff to permit her to put on the defense that she has. And I can represent to the Court that in my professional opinion she has a defense in this case which a jury should be allowed to decide.

. . . .

When asked about reasons why she did not want to be represented by her appointed counsel, Ferguson principally responded that a lawyer who was paid by the government could not fairly represent her. . . .

. . . .

Ferguson also expressed some complaints about trial counsel's handling of her case [each of which was dismissed by the trial court].

*State v. Ferguson*, 254 Kan. 62, 864 P.2d 693, 695–97 (1993).

In the Report and Recommendation ("R & R"), Magistrate Judge Walter continues the case history as follows:

Following plaintiff's competency evaluation at Larned State Hospital in October of 1991, the motion to substitute counsel was renewed and denied by the trial court. While the state court found "little doubt that the breakdown in communication between Ferguson and counsel was absolute," *Ferguson*, 864 P.2d at 701, they concluded the "appointment of substitute counsel would have been an exercise in futility." *Id.* at 702. The Kansas Supreme Court explained:

The record supports the finding by the district judge that there was no basis on which to appoint substitute counsel for Ferguson. She refused to cooperate with her counsel and caused or substantially contributed to the problems of which she now complains. She cannot now complain of a trial error which was of her own making. We conclude that the conflict was due to her refusal to communicate or cooperate with her counsel; therefore, her right to counsel was not violated.

*Id.* at 702–703.

The competency issue was presented to the trial court on November 13, 1991, and the trial court accepted the Larned Hospital staff's conclusion that petitioner was competent to stand trial in that she understood the nature and purpose of the proceedings against her, and was able to as-

sist her attorney in making her defense. Finding no abuse of discretion in the competency decision, the Kansas Supreme Court affirmed. *See id.* at 703–705.

Finally, the state court rejected petitioner's argument that she was subjected to a custodial interrogation before she had been advised of her Miranda rights or, alternatively, that if any statements were taken in contravention of the 5th Amendment, their admission was not reversible error. *See id.* at 707–709.

## B. Federal Proceedings/Evidentiary Hearing

Plaintiff filed her petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254, on August 4, 1995. An evidentiary hearing, limited to the issue of whether petitioner was denied counsel, was held in this action on November 13, 1998. Petitioner was called as a witness, as was Ron Wurtz and Dr. Modlin.

Wurtz testified credibly to the following. Petitioner was initially reluctant to relate any details about the fire. With the passage of time and Wurtz pushing for more information from Ferguson, Ferguson withdrew and would not provide even background information relating to her childhood or her marital relationship. Wurtz described several different approaches to open communication with Ferguson—one of which was to shock her into cooperating by appearing to be angry and yelling and backing her into a corner. He believes this approach harmed their relationship. Prior to trial, their relationship deteriorated to one with virtually no communication. While Wurtz suspected Ferguson might have a valid battered woman syndrome defense, she would not discuss her prior relationship with her ex-husband and refused to allow Dr. Parks to share with counsel information learned from his psychiatric consultations.

Ferguson testified that she was upset with Wurtz for a number of reasons: Wurtz did not appreciate her worries about her son's service in Saudi Arabia; she believed Wurtz was sharing confidences with the Prosecution; and Wurtz's yelling at her frightened her and reminded her of her ex-husband's conduct toward her.

Dr. Modlin reviewed an affidavit he prepared in 1994 and explained that "Schizoaffective disorder depressive type," the diagnosis of the Larned State Hospital team, is characterized by paranoia and delusional and irrational thinking. He opined that petitioner's mental disorder interfered with her ability to work with her attorney.

Subsequent to the evidentiary hearing, it was recommended this action be dismissed for petitioner's failure to fully exhaust her state remedies. Further explanation of the conflict between petitioner and her counsel and specific conduct which precipitated the conflict, as presented at the evidentiary hearing, was viewed by this court as evidence which placed petitioner's claim in a significantly stronger position. Relying upon *Demarest v. Price,* 130 F.3d 922 (10th Cir.1997), the action was dismissed to allow further state exhaustion.

## C. Remand by Tenth Circuit

The dismissal of this action was appealed to the Tenth Circuit. The circuit court concluded petitioner had exhausted her Sixth Amendment claim in the state forum, reversed the dismissal of her § 2254 petitioner and remanded this case with directions to consider the habeas petition. (R & R at 4–8).

## II. PETITIONER'S FEDERAL HABEAS CLAIMS

Petitioner brings the following claims in the present § 2254 action: (1) petitioner was denied due process when the trial court found her competent to stand trial; (2) the trial court's denial of appointed counsel's repeated motions to withdraw, which were premised upon a total breakdown in communication between petitioner and her counsel, violated petitioner's right to counsel and to due process of law; and (3) the trial court's admission of state-

ments made by petitioner violated her Fifth Amendment privilege against self-incrimination. In the R & R, Magistrate Judge Walter recommends denying habeas relief on petitioner's first and third claims, i.e., the incompetency and Miranda claims. However, Magistrate Judge Walter found petitioner's second claim to be meritorious and recommended granting relief in the form of a new trial.

### III. STANDARD OF REVIEW

The standard for district court review of a magistrate judge's R & R is contained in 28 U.S.C. § 636, which provides as follows:

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1)(C). As stated in the Code, the district court must make a *de novo* determination regarding the portions of the R & R to which objections have been filed. *Id.* Respondents have filed a limited objection (Doc. 79) to the present R & R. Respondents only assert an objection to Magistrate Judge Walter's recommendation to grant relief on petitioner's right to counsel claim.

■ As Magistrate Judge Walter noted in the R & R, because the present § 2254 petition was filed prior to the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the pre-AEDPA standards for reviewing federal habeas petitions must be used. Therefore, under these standards, a state court's findings of fact are afforded a presumption of correctness and both legal and mixed questions of fact and law are reviewed *de novo*. *See Castro v. Ward,* 138 F.3d 810, 815–16 (10th Cir.1998). A "presumption of correctness will continue to apply to any findings of fact underlying mixed ques-

tions." *Id.* (citing *Case v. Mondragon,* 887 F.2d 1388, 1393 (10th Cir.1989)). The underlying question before a federal habeas court reviewing a state conviction is whether petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a) (1994).

### IV. DISCUSSION

Respondents apparently levy two objections regarding Magistrate Judge Walter's findings within petitioner's right to counsel claim. First, respondents argue that in light of recent case law developments, the standard Magistrate Judge Walter used to evaluate petitioner's claim has been called into question. Second, respondents specifically argue that Magistrate Judge Walter incorrectly found that before and during trial, the trial court failed to properly inquire into petitioner's right to counsel claim. The court will limit its review to these issues.

### A. Proper Legal Standard

■ Petitioner's claim is premised on the notion that the alleged communication breakdown she and her counsel, Mr. Wurtz, encountered, resulted in a deprivation of her right to counsel as secured by the Sixth Amendment. *See* U.S. Const. amend. VI. In considering this question, Magistrate Judge Walter employed a standard enunciated by the Tenth Circuit Court of Appeals in *Romero v. Furlong,* 215 F.3d 1107, 1113 (10th Cir.2000). In *Romero,* the circuit court adopted the following four phase inquiry:

> (1) whether Appellant made a timely motion requesting new counsel; (2) whether the trial court adequately inquired into the matter; (3) "whether the conflict between the defendant and his attorney was so great that it resulted in a total lack of communication preventing an adequate defense;" ... [and] (4) whether the defendant substantially and unjustifiably contributed to the breakdown in communication.

215 F.3d at 1113 (quoting *Bland v. California Dep't of Corr.*, 20 F.3d 1469, 1475 (9th Cir.1994); and citing *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir.1970)). The first three phases of this analysis were directly adopted from the Ninth Circuit's opinion in *Bland*.

Respondents now question the validity of this four-phase analysis considering the Ninth Circuit's recent decision in *Schell v. Witek*, 218 F.3d 1017 (9th Cir.2000) (en banc), which overruled *Bland*. Respondents assert that because the Tenth Circuit adopted three of the four steps of its analysis from a now overruled Ninth Circuit case, this court should look unfavorably upon Magistrate Judge Walter's use of the standard. The court disagrees and believes respondents have misinterpreted the holding of *Schell* and its import on this court.

Contrary to respondents' assertion, it appears from the court's own reading that while the *Schell* court overruled the overarching standard controlling the inquiry in *Bland*, the court did not intend a complete departure from the three-phases of the analysis created within *Bland*. *See Schell*, 218 F.3d at 1025 (replacing an "abuse of discretion" standard with a standard solely focused on whether a state convict is in custody in violation of the Constitution).

In any event, the decision in *Schell* is not controlling on this court, and the court is unpersuaded that the Tenth Circuit "blindly" adopted the *Bland* inquiry. In fact, the test was adopted with a significant addition-specifically, the fourth element. Finally, the court notes that in *Romero* the Tenth Circuit applied the four phase analysis within the question of whether the appellant received constitutionally defective representation, not whether the trial court had abused its discretion. *Compare Romero*, 215 F.3d at 1113 ("In deciding whether a complete breakdown in communication rendered Appellant's representation constitutionally ineffective, we consider four factors."), *with Bland*, 20 F.3d at 1475 ("When reviewing the denial of a motion to substitute counsel

for abuse of discretion, we consider the following three factors...."). It was precisely this misuse of the "abuse of discretion" standard the *Schell* court was addressing. *See Schell*, 218 F.3d at 1024. Therefore, the court finds Magistrate Judge Walter's use of the *Romero* standard appropriate and finds respondents' objection lacking in merit.

**B.  Adequacy of Court's Inquiry**

■ Respondents do not assert any objection to Magistrate Judge Walter's conclusions regarding steps one, three, or four of the *Romero* analysis. Their objection is limited only to step two, i .e., whether the trial court adequately inquired into the matter. The R & R succinctly describes the multiple hearings and motions brought before the trial court concerning this matter. (R & R at 9–14).

Respondents' objection is founded on the proposition that petitioner and her counsel's communication breakdown was the direct product of petitioner's distrust for any attorney paid by the State. This was certainly the most compelling reason given by petitioner in the first hearing on Mr. Wurtz's motion to withdraw: "I don't feel like anybody that works for the State will help me the way that I should be helped." (Hr'g, Apr. 17, 1991, Tr. at 7). Respondents contend that this distrust of state funded representation continued throughout the pretrial and trial phases of petitioner's case, and because any appointed attorney would necessarily be state funded, appointing substitute counsel would have been futile. *See Ferguson*, 864 P.2d at 702 (finding substitution of counsel futile because of petitioner's distrust of all state funded attorneys). Therefore, according to respondents, the trial court satisfactorily inquired into the matter during the first hearing in April. Further inquiry would have been redundant.

However, Magistrate Judge Walter found that after the initial hearing in April, petitioner and Mr. Wurtz indicated to the trial court that more than the state fund-

ing of counsel was contributing to their communication breakdown. In particular, at the November 13, 1991, hearing, Mr. Wurtz noted "the fact of payment of counsel, only [petitioner] can answer whether that makes a difference to her, and the Court may obviously inquire. But, that is not what I have found to be an overriding concern in her expressions of discontent with me." (Hr'g, Nov. 13, 1991, Tr. at 13). However, the court made no inquiry.[1] Instead, relying on its memory of the hearing held approximately seven months earlier, the court ruled appointment of counsel was unwarranted due to the state funding of counsel issue. When Mr. Wurtz reiterated his motion to withdraw on the morning of trial, the court declined, again relying on its prior understanding, to inquire into the matter.[2]

After reviewing the events taking place between the April hearing and the start of trial in November, Magistrate Judge Walter concluded that the trial court had not adequately inquired into the matter. (R & R at 14).

The court finds the *Romero* case beneficial in deciding this matter. In *Romero*, the appellant was convicted in a Colorado State court of second degree burglary. 215 F.3d at 1109. In a bifurcated proceeding, the jury determined that the appellant was a "habitual criminal" pursuant to Colorado law, and he was sentenced to life in prison. *Id.* Prior to trial, the prosecution announced that it would call a Mr. Davis as a witness at the habitual criminal proceeding. *Id.* Mr. Davis had represented the appellant in a previous criminal manner, which was being used in the proceeding to establish the appellant's "habitual" nature. *Id.* As fate would have it, Mr.

Davis was a public defender who worked in the same office as the appellant's current counsel, Ms. Jordan. *Id.* "Ms. Jordan became concerned that the prosecution's intention to call Mr. Davis as a witness against the Appellant created a potential conflict of interest. After holding a hearing on the issue, the trial court decided to appoint private counsel to represent Appellant during the habitual criminal phase of the trial." *Id.* The trial court asked appellant if he still wished to be represented by Ms. Jordan, to which appellant responded, "Yeah, I guess, yeah. No, I don't then." *Id.* at 1114.

In his motion for post-conviction relief, the appellant argued he believed that Ms. Jordan was under a conflict of interest, which made it impossible for him to trust her and lead to a complete breakdown of his relationship with Ms. Jordan. *Id.* at 1110. Appellant eventually presented this denial of counsel claim to the federal district court, which denied him relief. *Id.* Upon review by the Tenth Circuit, the circuit court stated the following when considering the second phase or inquiry element of the analysis:

> As to the second factor, we similarly doubt whether the trial court failed to make an adequate inquiry under the circumstances. After Appellant made the above statement, the court inquired of Ms. Jordan whether, in her opinion, the conflict would be resolved through the appointment of separate counsel for the habitual offender proceedings. She indicated that it would. Following that exchange, the Appellant failed to renew his objection or to suggest in any way that he still had a claim of ineffective counsel

1. At the November 13th hearing, the assistant district attorney also encouraged the trial court to inquire into whether the communication breakdown went beyond the state funding issue. (Hr'g, Nov. 13, 1991, Tr. at 12).

2. However, on the eve of trial, even the assistant district attorney was concerned that additional elements may have been contributing to the communication breakdown. The assistant district attorney, Mr. Debenham, stated:

> What I'm concerned about now—and I'm looking at the possibility of having to retry it if that's what happens—is if the relationship has deteriorated to the point not solely because of [the state funding issue], but because of the reason either Mr. Wurtz' personality, just whatever, but that they have no communication whatsoever between them. . . .
>
> (Hr'g, November 18, 1991, Tr. at 8).

based on a total breakdown of communications. The court, therefore, quite reasonably could have assumed that it had adequately addressed Appellant's concern as a matter of law, even if Appellant did not agree with the ruling. In light of Appellant's equivocation, we are reluctant to conclude that the district court should have deduced some larger problem and expanded the scope of his inquiry beyond the conflict of interest issue.

*Id.* at 1114.

The court notes the distinctions between the present case and *Romero.* The present petitioner, through counsel, renewed her motion on several occasions, and most importantly, indicated additional factors were contributing to the communication breakdown between Mr. Wurtz and herself. In essence, this petitioner, unlike the appellant in *Romero,* was repetitively telling the court she "still had a claim of ineffective counsel based on a total breakdown of communication." *Id.* In light of this fact, this court is *not* reluctant to conclude that the trial court should have expanded the scope of its inquiry and considered matters beyond the already settled state funding issue. Merely because the state funding issue was fully developed, did not excuse the trial court from adequately inquiring into the additional motions and justifications proffered by petitioner. Therefore, the court agrees with Magistrate Judge Walter's recommendation and finds respondents' objection lacking in merit.[3]

## V.  CONCLUSION

Having determined that both of respondents' objections lack merit, the court finds that Magistrate Judge Walter correctly decided all material issues concerning petitioner's request for habeas relief.

---

[3]. Respondents make no objection to Magistrate Judge Walter's conclusion that petitioner and Mr. Wurtz suffered a complete communication breakdown sufficient to prevent an adequate defense. The extent of this breakdown was dramatically revealed directly

Therefore, the court will adopt Magistrate Judge Walter's recommendations.

**IT IS THEREFORE BY THE COURT ORDERED** that the Report and Recommendation (Doc. 78) is accepted and adopted. Petitioner's habeas corpus petition is conditionally granted. Relief will be granted for petitioner's claim that she was denied her Sixth Amendment right to assistance of counsel.

**IT IS FURTHER ORDERED BY THE COURT** that petitioner shall be released from custody unless, within 120 days of the issuance of this order, a new trial is commenced.

prior to trial. Upon voluntarily leaving her own motions hearing, petitioner stated in regards to Mr. Wurtz, "I don't consider him as my lawyer. I wish to leave." (Hr'g, Nov. 13, 1991, Tr. at 35).