**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 28 2002**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

LENA B. FERGUSON,

      Petitioner - Appellee,

v.

RICHARD KOERNER, Warden; and the
ATTORNEY GENERAL OF THE
STATE OF KANSAS,

      Respondents - Appellants.

No. 01-3058
(D.C. No. 95-CV-3323-DES)
(District of Kansas)

---

**ORDER AND JUDGMENT**[*]

---

Before **EBEL**, **GIBSON**[**], and **PORFILIO**, Circuit Judges.

In this case, the Warden of the Topeka Correctional Facility, Richard Koerner, and

the Attorney General of the State of Kansas, Carla Stovall (State, collectively), appeal the

granting of Lena B. Ferguson's petition for a writ of habeas corpus under 28 U.S.C.

---

[*]This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. This court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

[**]The Honorable John R. Gibson, Circuit Judge for the United States Court of
Appeals for the Eighth Circuit, sitting by designation.

§ 2254. Relief was premised on the district court's conclusion the state trial court, in violation of the Sixth Amendment, improperly denied Ms. Ferguson substitute counsel after she and her appointed counsel informed the court of the total breakdown in communications in between the defendant and her attorney.

Seeking reversal of that judgment, the State here asserts the trial court's refusal to substitute counsel was fully supported by the substantial evidence that Ms. Ferguson's distrust of her counsel was irrational and a product of her contempt for the entire judicial process. Moreover, the State contends the district court's holding has improperly expanded rights protected under the Sixth Amendment by requiring a "meaningful relationship" between a defendant and her counsel.

Nevertheless, we conclude the district court did not err because the peculiar facts of this case disclose that despite substantial evidence, the state court failed to inquire into the role Ms. Ferguson's mental capacity played in her inability to communicate with her appointed counsel. Its analysis of the breakdown of the relationship was therefore flawed and unsupportable. We agree with the district court and affirm its judgment.

## I. Background

On direct appeal, the Kansas Supreme Court affirmed Ms. Ferguson's convictions, rejecting her Sixth Amendment and competency claims. *State v. Ferguson*, 864 P.2d 693, 694-95 (Kan. 1993). Among the facts the court recited relating to Petitioner's conviction was her admission of killing a man and setting him on fire. Subsequent

- 2 -

investigation established the decedent was Petitioner's former husband. From the outset, Ms. Ferguson did not deny her entanglement in the crime. Although Ms. Ferguson told investigators she did not intend to kill, there is no doubt in the record the crime was flagrant.

The crux of this case, however, lies within Ms. Ferguson's psychological problems, first diagnosed in 1983, several years before the crime of which she was convicted. After an initial evaluation, Dr. Herbert Modlin[1] of the Meninger Clinic concluded Ms. Ferguson suffered from Mixed Personality Disorder with Paranoid and Avoidant Features.[2] During this time, Ms. Ferguson's son was stationed in Saudi Arabia, a fact which plunged her into a deep depression, including a loss of sleep precipitated by recurring nightmares of his death. Her fears were exacerbated when her ex-husband cancelled her long distance service, disconnecting her from any news of her son.

---

[1]The Kansas Public Defender's Office called Dr. Modlin the day after Ms. Ferguson's arrest. In that and a subsequent interview, Dr. Modlin reported Ms. Ferguson was "depressed, tearful, and tense" about her son and exhibited signs of paranoia, refusing meals, served by food handlers who did not wear gloves, medications, and injections. She told Dr. Modlin the interview rooms were bugged.

[2]The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 220-21 (3d ed. 1980) (DSM-III), the version used at the time of treatment, defines this condition as a "chronic disturbance of mood involving either depressed mood or loss of interest or pleasure in all, or almost all, usual activities and pastimes." The paranoia includes "unwarranted suspiciousness and mistrust of people which makes the person reluctant to confide in others for fear the information will be used against her. The avoidant features include a hypersensitivity to potential rejection or humiliation."

To defend the charges of first degree felony murder and aggravated arson, the trial court appointed Ron Wurtz, a District Public Defender, who appeared at the first preliminary hearing on February 15, 1991. From the outset, Ms. Ferguson complained that because Mr. Wurtz was hired and paid by the State of Kansas, he could not possibly represent her interests. On March 29, 1991, Mr. Wurtz filed a motion for continuance alleging Ms. Ferguson's "emotional turmoil" and the trauma of the events rendered her incapable of assisting him in preparing for trial and crafting a defense. On April 16, 1991, Mr. Wurtz filed a second motion for a continuance based on Ms. Ferguson's hospitalization for treatment of her mental illness.[3] Her psychiatrist, Dr. Gilbert Parks, subsequently testified at the hearing on the motion that Ms. Ferguson was severely depressed "with suicidal plan and ideations." He opined not only was she so ill she could not endure the stress of trial or assist in her defense, but also, she should not have any contact with Mr. Wurtz[4] unless counsel went through him. The court granted this

---

[3]Mr. Wurtz also filed his first motion to withdraw, stating that Ms. Ferguson "has no confidence in her present counsel or in any counsel who is employed by the Public Defender's office. Said conflict and absence of confidence is [sic] so serious that the attorney-client relationship is so adversely affected that there is effectively no counsel for the accused."

[4]Mr. Wurtz testified at the habeas hearing he tried every means to persuade Ms. Ferguson to cooperate but was usually arguing with her to help herself. In a prior affidavit, Mr. Wurtz stated,

> I tried many methods to get Ms. Ferguson to communicate with me. I cried with her. I threatened her with the possibility of prison. I sent some of my staff to talk with her. I yelled at her. I even tried physical intimidation to

(continued...)

continuance and set July 29, 1991, for trial unless Mr. Wurtz raised concerns about her

competency.

On July 24 1991, Mr. Wurtz filed a motion to determine competency, stating in

part:

> The only method counsel has of trying to communicate with his client is by passing information to Dr. Parks. Dr. Parks is not a lawyer, and counsel cannot be personally satisfied that [petitioner] is receiving proper legal information with which she can make the decisions that are the client's to make, such as whether to testify or to enter plea negotiations. Counsel believes [petitioner's] mental condition precludes her from thus assisting in her defense.

On the following day, the trial court ordered Dr. James Horne, a court psychiatrist, to

evaluate Ms. Ferguson. After examination, Dr. Horne concluded Ms. Ferguson was

incompetent to stand trial because she suffered from a mental illness and exhibited signs

of paranoia. Though he judged her "oriented, cooperative, and alert," Dr. Horne

recommended Petitioner was incapable of working with her attorney. On that basis, the

court found Ms. Ferguson incompetent to stand trial, committed her to the Larned State

Security Hospital, and ordered the staff to report on her progress within sixty days.

---

[4](...continued)
get her to understand the consequences of not communicating with me by blocking her exit from the interview room and backing her into a corner. None of these methods worked, and I became increasingly frustrated.

Ms. Ferguson testified she asked him to get her counseling when she was in jail, but he failed to provide anyone. She stated she saw Dr. Parks on her own initiative when she was out on bond.

In that report submitted on October 21, 1991 (the Report), the evaluating staff diagnosed Petitioner with Schizoaffective Disorder, Depressive Type, described in the DSM-III as a disorder in which the individual suffers from delusions or hallucinations. Nonetheless, the staff concluded she was competent to stand trial:

> [Ferguson's] expressed unwillingness to cooperate with the attorney appears to be related to her strong feelings of being let down by him because he never contacted her and was not working in her best interest while she was in jail. There are no strong indications to suggest that her mental illness is the basis for her lack of trust in her attorney.

*Ferguson*, 864 P.2d at 701.

Five days before trial began and shortly after Ms. Ferguson was discharged from Larned, Mr. Wurtz again moved to withdraw as counsel. In support, he stated:

> Your Honor, my request to withdraw as counsel is somewhat tied up with the [competence] report, as the Court knows the contents of that report. I respectfully request permission to withdraw from this case as counsel for Ms. Ferguson for the reason that although the doctors think she's able to--she's able to cooperate with counsel, I have my own lay suspicions and sincere beliefs that she cannot cooperate with me.

> Since her release from the Larned State Security Hospital, I have communicated with her physician, Doctor Gilbert Parks, and that, as far as I know, is the only communication directly that I had with Ms. Ferguson until actually yesterday when I spoke with her briefly on the phone. Ah, I had passed several requests through Doctor Parks that she come in and talk to me. She has not done so. I do not know the reasons why except that she has a deep and abiding distrust of everything I do. She feels, Your Honor, that everything she tells me, that I pass on to the District Attorney. And the way she presents herself, I think she sincerely believes that. The district attorney can tell you whether it's true or not, which, of course, it's not. But she believes it. If she firmly believes that, it follows that she would be in fact protecting herself by not telling me what I need to know in order to put on a defense.

- 6 -

Your Honor, back when I first represented her, within the first month, we had communication. During that communication, she provided me with some details which I needed in order to begin working up a defense. That, however, was before I had completely investigated it myself. And as the Court may understand, without me releasing any confidences in this request, questions have come up which I believe that only Lena Ferguson can help me deal with. She cannot do that. She says she cannot do that because she does not trust me.

One of the grounds for allowing withdrawal of counsel is that the attorney-client relationship has deteriorated to the point that it is effectively no relationship at all. When I spoke with Ms. Ferguson yesterday over the mix-up, and as I advised the Court, my failure to make sure she was notified of the hearing set yesterday, she very clearly told me both today and yesterday, that she believed that I had done that in order to make her look bad. In her demeanor and in her statements, she appears to be sincere in that.

Your Honor, a defense lawyer's relationship with his client is the key to a good defense, not just a competent defense. It's certainly a key to a competent defense. But really, in this case, it's a key to a defense at all.

. . . .

In the present state of our relationship, as I see it, there being no relationship, I don't believe I can effectively present a defense on her behalf. And I sincerely believe that.

As I have been preparing for this intensively for the last week after the Court has advised us of the trial--I was prepared once before, but it takes some time to get back up to speed again--there are questions that I fear without her having some trust in me, that I will ask one wrong question or say one wrong thing that I would know to avoid if she could communicate with me.

. . . .

I am totally frustrated and I hope that doesn't get into it. But when I get frustrated, that's a side event that causes me not to concentrate too. And I worry about how effective I can be under these circumstances. And I

- 7 -

implore this Court to consider appointing counsel knowing that it would necessarily result in another postponement of the trial, but I think fairness requires that.

At that time, Mr. Wurtz also stated Petitioner's distrust "is deeper than simply who is paying the bill." He expanded, "[S]he has much--many more complaints about things that have happened in the past." Later in the hearing, Ms. Ferguson asked to be excused from the proceedings. Given that request, Mr. Wurtz renewed his motion to withdraw, stating that it was "extremely dangerous for a defense lawyer to consent to his client leaving when there may be a question that needs to be answered" and that her request was a "further demonstration . . . of the fact that [their] relationship is such that she cannot help [him]." Nonetheless, the trial court denied the motion to withdraw and allowed Ms. Ferguson to leave the hearing.[5]

On November 18, 1991, the morning of the first day of trial, Mr. Wurtz again moved to withdraw, stating in his supporting brief,

> [S]ince [petitioner's] release from jail she has consistently refused to discuss the matters which have resulted in the charges now pending against her. She has expressed the belief that present counsel is in league with the authorities who seek to punish her for the events which are the foundation

---

[5]The court stated,

> If she elects not to discuss her case with Mr. Wurtz, or to fully cooperate, I can only conclude that it is her conscious decision not to do so, and it is her responsibility for taking that position. Mr. Wurtz has done nothing in this case to justify releasing him. He is a highly competent, highly experienced attorney. He has done everything in the Court's view to represent his client effectively and diligently. And I find no ground, whatsoever, to grant this request.

for this action. She currently refuses to even come to counsel's office to permit counsel to explain the trial process, seek her input on jury selection, discuss the theory of the case which must be presented in light of her refusal to testify, and generally to assist counsel in even the most rudimentary matters.

Further, he stated to preserve client confidences he could not fully disclose the "incidents supporting his belief;" thus, he could not provide Ms. Ferguson "constitutionally valid assistance under the conditions" that then existed. Mr. Wurtz asserted he had nothing to add factually to his previous motions, but that in his final preparation for trial, he did not have Ms. Ferguson's assistance in clarifying some questions in preparing for cross examination.

The trial court again denied the motion, emphasizing that Mr. Wurtz was a highly qualified attorney, a fact which it believed removed any reasonable basis for substituting him. In support, it remarked that Mr. Wurtz succeeded in reducing Petitioner's bond to secure her release. The trial court then based its conclusion solely on testimony that was offered at a hearing held a week before Dr. Parks saw Petitioner and before either of her hospitalizations occurred.[6] Trial proceeded, culminating in a guilty verdict.

---

[6]The court stated,

She has shown no lack of diligence, no dereliction of duty. I can only gather and conclude that her failure to communicate satisfactorily with Mr. Wurtz is not only unreasonable, but the result of a conscious decision by her. Now if that's her conscious decision, then I don't think the consequences of that decision should be visited on the Court or deprive the Court of its ability to try the case.

In rejecting the Sixth Amendment claim, the Kansas Supreme Court set forth some of this history but characterized it, much like the trial court had, to reflect Petitioner's dissatisfaction with Mr. Wurtz's competence as a lawyer. Quoting the Report, the Supreme Court observed:

> The district court judge who received this recommendation, unlike the staff members who made it, was aware that Ferguson's complaints of her counsel's lack of diligence were not supported by the facts. He knew that Ferguson's bond had been reduced and she had been released from jail. With regard to her complaint that her competency evaluation should have occurred at an earlier time, the district court knew that her personal psychiatrist, Dr. Parks, testified on May 1 that she understood the nature and purpose of the legal proceeding against her and that, with (his) treatment for a month or two, she would be able to assist in her defense. The district judge knew that Dr. Parks had testified in May that Ferguson had a "suspicious distrust almost at a paranoid level which makes it difficult for her to cooperate with anyone *at this point*."

*Ferguson*, 864 P.2d at 701 (emphasis added). Citing *Thomas v. State,* 421 So. 2d 160 (Fla. 1982), and *State v. Long,* 669 P.2d 1068 (Mont. 1983), the court concluded although the breakdown in communication between Ms. Ferguson and Mr. Wurtz was "absolute, her refusal to cooperate is not of itself basis for reversal on grounds of ineffective assistance of counsel." 864 P.2d at 701. Observing that "arguably" the trial court should have appointed substitute counsel, it opined "[t]here is no reason to believe such a substitute counsel would fare any better than trial counsel did." *Id.*

## II.  Relief under § 2254

Petitioner then proceeded with her federal habeas action. After her petition was dismissed for failure to exhaust state remedies, this court reversed and remanded the case,

- 10 -

holding all of Ms. Ferguson's "new evidence" simply supplemented rather than fundamentally altered her claim. *Ferguson v. McKune*, No. 99-3214, 2000 WL 1133134 (Aug. 10, 2000) (unpublished). In that appeal, as here, the State argued Petitioner transformed her Sixth Amendment claim from one based on distrust of an attorney paid by the State, to one mired in the details of her poor relationship with Mr. Wurtz. We responded:

> Our review of the record does not bear this out. Mr. Wurtz clearly, repeatedly, and emphatically informed the trial court that there were other reasons petitioner did not trust him and would not cooperate with him. Indeed, he stated that petitioner's distrust of state-paid attorneys was not the overriding reason for their bad relationship. Rather, it was the Kansas courts that focused the attention on petitioner's distrust of an attorney in the state's employ. The fact that the Kansas courts chose to concentrate on petitioner's professed distrust of such an attorney, however, is not dispositive of our exhaustion analysis. We conclude that petitioner exhausted her Sixth Amendment claim in the state forum.

2000 WL 1133134, at * 8.

After remand, an evidentiary hearing was held by a Magistrate Judge who forwarded a recommendation the writ be granted. In adopting that recommendation, *Ferguson v. Koerner*, 131 F. Supp. 2d 1208, 1214 (D. Kan. 2001), the district court employed the four-step inquiry we set forth in *Romero v. Furlong* to decide whether the complete breakdown in communications rendered the attorney's representation constitutionally ineffective. 215 F.3d 1107, 1113 (10th Cir. 2000). Those four factors are: (1) whether petitioner made a timely motion requesting new counsel; (2) whether the trial court adequately inquired into the matter; (3) whether the conflict between the

- 11 -

petitioner and her attorney was so great it resulted in a total lack of communication; and (4) whether petitioner substantially and unjustifiably contributed to the breakdown in communication. *Id*.

The district court agreed with the State that only the second factor was at issue in this case, that is, whether the trial court adequately inquired into the matter. It found the trial court correctly inquired into Ms. Ferguson's distrust based on her attorney's state funding. Nonetheless, it concluded the trial court unequivocally failed to inquire into Mr. Wurtz's representations that other factors contributed to the breakdown in communications. In support, the district court cited Mr. Wurtz's November 13 statement: "the fact of payment of counsel, only [Petitioner] can answer whether that makes a difference to her, and the Court may obviously inquire. But that is not what I have found to be an overriding concern in her expressions of discontent with me." The district court pointedly observed this statement provoked no further inquiry by the trial court, which instead relied upon its memory of a hearing seven months previously. The district court also observed on the morning of trial the court "declined, again relying on its prior understanding, to inquire into the matter."

Guided by the factual contrasts presented by *Romero*, in which relief was denied, the district court noted, in Ms. Ferguson's case, the motion to substitute counsel was renewed "on several occasions, and most importantly, indicated additional factors were contributing to the communication breakdown between Mr. Wurtz and herself." 131 F.

Supp. 2d at 1214. Upon these facts, the district court stated, it was "*not* reluctant to conclude that the trial court should have expanded the scope of its inquiry and considered matters beyond the already settled state funding issue." *Id*. at 1215.

Like **Romero**, this case is pre-AEDPA; thus, the standard of review **Romero** enunciated applies here:

> As a federal court conducting a review in habeas of state court determinations, our role is secondary and limited. Although we review legal conclusions de novo, a state court's factual findings are entitled to a presumption of correctness. Mixed questions of law and fact are reviewed de novo, but the presumption of correctness will continue to apply to any findings of fact underlying mixed questions.

215 F.3d at 1110 (*citing* **Castro v. Ward**, 138 F.3d 810, 815-16 (10th Cir. 1998)). Thus, here, too, "[t]he substance of our review is confined" to whether Ms. Ferguson is "in custody in violation of the Constitution or laws or treaties of the United States." *Id*.; 28 U.S.C. § 2254(a) (1994).

Although the State concedes **Romero** is "good law," it urges, "its analytical framework must be applied in a habeas case with a more demanding standard of review." That contention is fatuous. As noted, **Romero** is a habeas case. By setting the stage in that fashion, however, the State seems bent upon convincing us that somehow an abuse of discretion standard sneaked in and infected the district court's analysis and review. Unequivocally, the district court set forth the correct standard, however.

Against this background, the State argues the district court simply "substituted its decision for that of the state trial court," rejecting factual findings and engaging in

"unwarranted fact-finding on its own." It maintains the trial court did not abuse its discretion in refusing to appoint substitute counsel in light of the uncontroverted fact the absolute breakdown in communications was tied entirely to Ms. Ferguson's "own irrational and uncooperative behavior." However, this and other of the State's arguments ignore the critical point that it is clear from the record, as it would have been clear to the trial court had it made further inquiry. Petitioner's irrational and uncooperative behavior was the product of her mental illness and not of a rational mind.

It cannot be gainsaid that open and free communication between client and counsel is the touchstone of the lawyer's effectiveness. In this case we are certain that touchstone was missing because of Ms. Ferguson's illness. That illness provoked delusional beliefs that prevented her from communicating with counsel so that he could effectively defend her. We do not share the state court's comfort that Mr. Wurtz was able to fully represent his client's interests simply because he was able to achieve some minor successes along the way without Petitioner's help. The overriding fact is Mr. Wurtz went to trial without a prepared defense because his client's sickness impeded her ability to communicate and furnish counsel the necessary assistance. Likewise, we also disagree with the state court there was no reason to believe different counsel would have been better able to represent Ms. Ferguson effectively. Indeed, we believe the record demonstrates the factors underlying her delusional rejection of Mr. Wurtz were attributable to him alone and were not a foreseeable deterrent to other counsel. We conclude a more judicious inquiry into

all the reasons provoking Mr. Wurtz's attempts to withdraw from the case would have illuminated these facts.

We conclude the district court correctly followed and applied the rule of ***Romero***. Its judgment is **AFFIRMED.**


ENTERED FOR THE COURT


John C. Porfilio
Senior Circuit Judge