(159 P.3d 194)
No. 92,408

STATE OF KANSAS, *Appellee,* v. DALE E. McCORMICK, *Appellant.*

830

Opinion filed May 25, 2007.

*Jessica R. Kunen,* of Lawrence, for appellant.

*Jacqueline J. Spralding,* assistant district attorney, special prosecutor, *Paul J. Morrison,* district attorney, and *Phill Kline,* attorney general, for appellee.

Before RULON, C.J., GREENE, J. and LARSON, S.J.

RULON, C.J.: Defendant Dale E. McCormick appeals his convictions for aggravated kidnapping, aggravated burglary, and aggravated intimidation of a witness or victim. The defendant challenges the district court's refusal to appoint substitute counsel; the admission of evidence seized in violation of the Fourth Amend-

ment; the admission of prejudicial photographs; the denial of the defendant's request for a psychological evaluation of the victim; and the court's jury instructions on aggravated kidnapping and aggravated burglary. The defendant further contends the prosecution prejudiced his ability to obtain a fair trial by withholding exculpatory evidence and committing multiple instances of misconduct. We affirm.

The defendant met the victim, Yasmin Haque, in a class at Washburn University in 1997. Thereafter a friendship developed as the two interacted socially on a limited basis and studied together. The defendant attempted to pursue a romantic relationship, but the victim continually rebuffed the defendant's advances, indicating she was not interested in a romantic relationship. Eventually, the victim told the defendant she no longer wished him to contact her. When the defendant continued to contact the victim she began to file police reports against the defendant.

Over the course of the next several years the defendant continued to contact the victim. At one point the defendant followed the victim home from a gas station to learn where she was currently living. Shortly thereafter the victim's daily journal was taken from her residence, and the defendant demonstrated possession of the journal by copying pages and leaving the pages on the porch of the victim's residence.

On February 7, 2003, the victim noticed the telephone box outside her residence was open. Fearing the defendant had tampered with her telephone lines, the victim called the police and the telephone company. A representative from the telephone company inspected the box but found no signs of tampering.

On February 16, 2003, at approximately 5:30 a.m., the victim was awakened by a noise which she quickly identified as the rustling of the mini-blinds in the living room. The victim grabbed the telephone by her bed and investigated the noise. Upon reaching the doorway between her bedroom and the living room the victim observed a man dressed in dark clothing and wearing a ski mask. The man appeared to be standing up after climbing through one of the living room windows.

The victim began screaming and tried to call the police, but she was unable to get a dial tone. The defendant then pulled off the ski mask and said, "Yas, it's me. It's me." The victim continued to scream until the defendant crossed the room and covered her mouth. Because the defendant was wearing gloves, the victim began to have difficulty breathing and she began to fight the defendant. The defendant grabbed the victim's wrists, overpowered her, and pushed her onto the bed. During the struggle the victim continued to try to call the police until the defendant forcibly removed the telephone from her. The defendant straddled the victim and kept her pinned to the bed. The defendant took his hand away from the victim's mouth when she agreed to stop screaming.

The defendant asked the victim why she had made false reports to the police and why she had written certain things in her journal. According to the victim the defendant said he planned to kill himself, and the victim worried that he might kill her first.

Because the victim appeared distraught the defendant offered to comfort the victim but the victim replied, "Excuse me. You fucking broke into my house." The defendant then stated the victim had called him, and the victim screamed. at the defendant, "What? I didn't call you, you fucking psychopath. I never called you." As the defendant again covered the victim's mouth she again struggled unsuccessfully to break free from the defendant.

After the victim stopped struggling and after she repeatedly commanded the defendant to get off her bed, the defendant stood and allowed the victim to stand, although he blocked the doorway out of the bedroom. The victim moved to the bedroom window and began looking out the window. The defendant then asked, "What are you waiting for? They're not coming." The victim assumed the defendant was speaking of the police. When the victim attempted to raise the mini-blinds the defendant prevented her; when she attempted to open the blinds he tried to pull her hand away from the wand, which came off in the victim's hand. Using the wand the victim began to hit the defendant on the neck, shoulders, and head until the defendant took the wand away from her.

Eventually, the victim insisted the defendant allow her to use the bathroom. The defendant initially refused to allow the victim

to shut the door but finally relented. The victim did not believe she could escape out the bathroom window because there was no lock on the bathroom door. When the victim emerged from the bathroom, the defendant stood only a few feet from the bathroom door. The defendant told the victim he could not live without his wife. When the victim replied that she was not his wife the defendant told her she was supposed to be his wife. When the defendant asked the victim to look him in the eye and tell him there was never a chance of them getting married the victim complied but the defendant refused to believe her.

After talking further the defendant pleaded, "Yas I fell in love with you. I can't close my heart to you now." However, when the victim did not respond, the defendant begged her not to call the police and promised to leave her alone in exchange for her promise not to report the incident to the police. When the victim told the defendant she would think about it the defendant decided to leave.

As soon as the defendant left, the victim went to the kitchen to try another phone. As she did so, the defendant reappeared at the open window and commented, "Oh, the window's still open." The defendant then shut the window and replaced the storm screen. After ascertaining the kitchen phone also was not working, the victim ran to a neighbor's house and asked to call the police.

The police arrived shortly after the victim called, and the victim left the neighbor's house to speak with the officers. As the victim reported the incident, the officers immediately relayed the information to dispatch and other officers were directed to the defendant's residence. The officers eventually took the victim to the law enforcement center to record her statement and then escorted her to the hospital for a physical examination. The examination noted only some bruising and swelling of the wrists which occurred when the defendant held and pinned the victim. However, the victim suffered a cut lip and some bruising on her legs which were not immediately apparent to the nurse examiner.

Receiving the name and description of the defendant from dispatch, Officers Monroe and Kelly drove to the defendant's residence. Seeing the defendant emerge from the back yard of his residence, the officers approached the defendant, who immedi-

ately stated, "She called you guys, didn't she?" Officer Kelly informed the defendant the officers needed to question him about an alleged trespassing incident and handcuffed the defendant. Meanwhile, Officer Monroe noticed a backpack near the defendant and placed it in the patrol car without searching the contents. The defendant was arrested, given his *Miranda* warnings, and transported to jail.

In conducting a routine pat down of the defendant before booking him, jail personnel discovered a ball gag in the defendant's right pants pocket and some keys. When the gag was discovered, the defendant voluntarily commented, "Some of us are into that kinky stuff, you know." The backpack was taken to the law enforcement center and inventoried as the personal property of the defendant. From the victim's account, the officers knew the defendant had been carrying the backpack when he entered the victim's residence.

The backpack contained a length of cotton rope, a wooden paddle with black tape wrapped around the handle, a homemade leather whip, a carton of Camel Light cigarettes, two cigarette lighters, a green journal notebook that the victim identified as the one taken from her residence, a yellow flashlight, a leatherman's tool, an 8-millimeter camcorder cassette, a padlock with its key, a hand-held socket ratchet with the 3/8" socket attached, a socket holder completely filled except the 3/8" socket, a choke chain, a yellow Phillips-head screwdriver, a package containing several items including a pen, some matches, $.36, and an empty tic-tac box, a loose camcorder battery, three condoms, loose cash amounting to $11, a checkbook with checks listing Dale McCormick as the account holder and seven $20 bills, a Dillard's charge card, and a camcorder.

A search warrant was obtained and executed on the defendant's residence. The return on the warrant indicated the officers seized floppy disks, VHS tapes, 8 millimeter camcorder cassettes, photographs, a black stocking hat, an envelope with the defendant's name and address, writable compact discs, micro-recorder audio cassettes, standard audio cassettes, an Apple I/MacIntosh com-

puter, a Compaq Presario computer, and a box of trash collected from the victim.

An investigation of the interior of the victim's living room revealed the dust on top of the interior window frame had been disturbed, and the mini-blinds covering the window were slightly disarrayed. A plant in front of the window had lost several of its leaves, some of which were green and healthy. An examination of the exterior of the residence indicated fresh wood shavings underneath the living room window. The officers noted the storm screen on the window was attached by only three screws. Using only a Phillips-head screwdriver, the officers removed the screen, and the frame swung to the ground near the corner that had fresh scrapes in the wood. Later, using a credit card, Detective Burket was able to unlatch the window from outside the residence.

Recalling the victim's statement that she was unable to hear a dial tone, Detective Burket checked the phone box outside the victim's residence. Although the box revealed no fingerprints, it required use of a 3/8" socket or Phillips-head screwdriver to open and to manipulate the wires inside. At the request of Burket, Ken Keane, the phone company representative who had examined the phone box on February 7, examined the box again and opined the arrangement of the phone box had been altered.

Eventually, the State charged the defendant with aggravated kidnapping, in violation of K.S.A. 21-3421 and K.S.A. 21-3420(b) or, in the alternative, K.S.A. 21-3420(c); aggravated burglary, in violation of K.S.A. 21-3716; and aggravated intimidation of a witness or victim, in violation of K.S.A. 21-3833(a)(1).

After a maelstrom of motions and hearings, which the district court patiently and fairly considered, the defendant stood trial on January 26, 2004, through February 5, 2004. The jury returned guilty verdicts on each charge. The defendant filed additional motions for a new trial and/or to set aside the verdict, which the district court denied after several hearings. The district court denied the defendant's motion for a downward sentencing departure. The court sentenced the defendant to serve 195 months in prison for the aggravated kidnapping conviction; 32 months for the aggravated burglary conviction; and 18 months for the aggravated intim-

idation of a witness conviction. The aggravated intimidation sentence was ordered to run consecutive to the kidnapping and burglary sentences; the aggravated burglary sentence was ordered to run concurrent with the kidnapping sentence; and the defendant's controlling sentence was 213 months in prison.

## Denial of Motion for Substitute Counsel

Of primary concern to this court on appeal is the district court's denial of the defendant's motion for substitute counsel. The defendant argues he did not wish to represent himself but was forced to proceed pro se when the district court refused to allow his appointed counsel to withdraw and to appoint new counsel.

## Refusal to Appoint Substitute Counsel

Although the Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to effective assistance of counsel, the right does not extend to providing an indigent defendant with the representation of his or her choice. Therefore, the decision to grant a criminal defendant new appointed counsel depends heavily upon the circumstances presented in a given case, and the district court possesses broad discretion in determining whether to appoint new counsel. *State v. Cromwell*, 253 Kan. 495, 856 P.2d 1299 (1993). An appellate court will reverse a judgment of the district court for an abuse of discretion only when no reasonable person would have adopted the view of the district court. *State v. Moses*, 280 Kan. 939, 945, 127 P.3d 330 (2006).

When a criminal defendant seeks the appointment of new counsel, the defendant must establish a justifiable dissatisfaction with the existing counsel, which has been narrowly interpreted to mean a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between counsel and the defendant. *State v. Jasper*, 269 Kan. 649, 654, 8 P.3d 708 (2000). Not all disagreements between counsel and defendants constitute irreconcilable conflicts or lead to complete breakdowns in communication. *State v. Ferguson*, 254 Kan. 62, 71, 864 P.2d 693 (1993).

In a closed hearing outside the presence of the State, the district court inquired into the basis for the defendant's request for new

counsel. The only conflict alleged by the defendant involved disagreements over trial strategy. Specifically, the defendant contended his attorneys refused to challenge his arrest, to challenge the search warrant on First Amendment grounds, to file a *State v. Gregg*, 226 Kan. 481, 602 P.2d 85 (1979), motion, and to utilize various other defense tactics the defendant believed were appropriate. The defendant's appointed counsel, Mark Manna and Alice White, agreed the conflict in the representation involved a fundamental disagreement in the appropriate trial strategies to be pursued in the defense. Manna further indicated that, without communicating with counsel, the defendant frequently filed motions which undermined defense trial strategies.

After hearing the comments of the defendant and his attorneys, the district court noted the defendant had previously been represented in this case by Joseph Johnson, who withdrew when the defendant refused to abide by Johnson's advice regarding the defendant's desire to file a civil suit while the criminal charges were pending. After Johnson withdrew, the court had a difficult time finding local attorneys capable of representing the defendant, due, in large part, to the number of conflicts these attorneys had with the defendant in prior representation. These conflicts occurred primarily because the defendant wished to control his own representation without regard to the advice of his attorneys.

Because the district court had heard nothing to indicate Manna and White's representation was deficient in any regard, the court found the defendant had not presented a justifiable dissatisfaction with his appointed counsel and denied the defendant's motion. The court reasoned:

"[W]e could go and [*sic*] on and on in this matter. If I make that ruling, then the next attorney is the same way. In other words, ultimately the attorney would have to agree with how you want to tactically approach this case.

"Now, I can't tell an attorney, 'I'm going to appoint you to Dale McCormick's case, but you have to do what he wants you to do.' That would be violating their oath and that would be, in a sense, you having standby counsel as opposed to— again, I could keep appointing attorneys until the chickens come home to roost, but there's no guarantee that you're going to get along with any of them, as far as their agreement on what should and shouldn't be filed, unless you have absolute

control of the case, and I can't guarantee you that by appointing you other counsel."

Because the district court refused to appoint new counsel, the defendant chose to represent himself. The district court ordered Manna and White to remain in the case as stand-by counsel.

In *Ferguson*, a criminal defendant requested substitute counsel based upon a complete breakdown in communication between her attorney and herself. Although our Supreme Court concluded the representation had suffered from a breakdown in communication, the *Ferguson* court refused to find an abuse of discretion in the district court's denial of the defendant's request for substitute counsel when the evidence clearly indicated the breakdown in communication was the fault of the defendant. 254 Kan. at 73-74. The *Ferguson* court reasoned:

"Arguably, the trial judge could have appointed substitute counsel for Ferguson, as was done in [*State v. Long*, 206 Mont. 40, 669 P.2d 1068 (1983)]. However, based upon Ferguson's testimony to the court, appointment of substitute counsel would have been an exercise in futility. The court had no viable option other than to appoint counsel paid by the State. There is no reason to believe such substitute counsel would fare any better than trial counsel did." 254 Kan. at 75.

The current case is distinguishable from the facts of *Ferguson* to the extent this defendant did not systematically refuse to cooperate with his counsel's requests like Ferguson. Nevertheless, the defendant's conduct in this case inevitably leads to the same result. A criminal defendant represented by counsel is entitled to control over three decisions: (1) whether to accept a plea; (2) whether to demand a jury trial; and (3) whether to testify. All other strategic and tactical decisions, including preparation, scheduling, and *the type of defense*, lie within the province of trial counsel. *State v. Rivera*, 277 Kan. 109, 116-17, 83 P.3d 169 (2004). While a criminal defendant has the right to consult with appointed counsel and to discuss the general direction of his or her defense, the strategic and tactical decisions are matters for the professional judgment of counsel. *State v. Bafford*, 255 Kan. 888, 895, 879 P.2d 613 (1994).

By refusing to follow the advice of his attorneys and by filing motions without their knowledge or consent, the defendant was attempting to control not only the direction of his defense but the

strategy and tactical decisions associated with that defense. Consequently, the irreconcilable conflict or breakdown in communication alleged by the defendant was caused by the defendant's conduct. The district court did not abuse its discretion in finding appointment of new counsel would be an exercise in futility under the circumstances.

## Pro Se Representation

Because the defendant lacked justifiable dissatisfaction with his appointed counsel, the defendant's decision to represent himself was not coerced by the district court's refusal to appoint new counsel. The defendant was presented with the choice of competent counsel to represent him or self-representation.

The Sixth Amendment guarantees a criminal defendant the right to self-representation. However, because the right of self-representation frequently conflicts with the right to representation by competent counsel, a court must adopt a presumption against waiver of the right to counsel, and a waiver of the right to represent oneself may be assumed by the failure to unequivocally assert the right. Once a criminal defendant clearly and unambiguously expresses a wish to proceed pro se, though, a court must allow the self-representation after obtaining a knowing and intelligent waiver of the right to counsel. *State v. Vann*, 280 Kan. 782, 793, 127 P.3d 307 (2006).

"Waiver of the right to counsel must be knowingly and intelligently made based on the facts and circumstances of each case. [Citation omitted.] Kansas courts have adopted a three-step framework to determine whether a waiver is knowing and intelligent. First, a defendant should be advised of both his or her right to counsel and right to appointment of counsel in cases of indigency. Second, the defendant must possess the intelligence and capacity to appreciate the consequences of the waiver. Third, he or she must comprehend the nature of the charges and proceedings, the range of punishments, and all facts necessary to a broad understanding of the case. [Citation omitted.]" *State v. Mixon*, 27 Kan. App. 2d 49, 51, 998 P.2d 519, *rev. denied* 269 Kan. 938 (2000).

Shortly after being charged, the defendant expressed a desire to handle his own defense until he could secure counsel. The district court required the defendant to complete a written waiver of counsel, which noted the maximum sentence for each charge inde-

pendent of the other charges and acknowledged the rights the defendant would waive by proceeding pro se.

After Johnson withdrew from the case, the defendant unsuccessfully sought to find new counsel. Consequently, the district court appointed Manna and White to represent the defendant. After several motions hearings, the defendant filed a motion indicating an intent to represent himself. When the district court denied the defendant's request to proceed pro se, the defendant filed his motion for substitute counsel. Because the defendant insisted on representing himself when his request for substitute counsel was denied, the district court reviewed the written waiver the defendant had earlier filed in the case.

Based on the record, we are satisfied the defendant's waiver of the right to counsel was knowing and intelligent. Under the circumstances, the district court properly allowed the defendant to proceed to represent himself. The district court took the additional precaution of assigning Manna and White to serve as stand-by counsel. The defendant's argument he was deprived of his Sixth Amendment right to counsel possesses no legal merit.

## Searches and Seizures

The defendant additionally challenges the district court's rejection of his Fourth Amendment claims. When a party challenges a suppression ruling on appeal, the reviewing court adopts those factual findings of the district court that are supported by substantial competent evidence but considers the ultimate legal determination independently. *State v. Hill*, 281 Kan. 136, 140, 130 P.3d 1 (2006).

### (A) Inventory Search of the Backpack

Generally, a search conducted without a warrant issued upon probable cause is unreasonable. The law, however, recognizes a few limited exceptions, including inventory searches. Inventory searches are considered reasonable because such serve three purposes: (1) the protection of the owner's property while it remains in police custody; (2) the protection of the police against claims of lost or stolen property; and (3) the protection of the police from

hazardous objects contained within a criminal defendant's personal property. *State v. Shelton*, 278 Kan. 287, 294, 93 P.3d 1200 (2004).

The linchpin of an inventory search analysis, as in every Fourth Amendment question, is reasonableness. See *Pool v. McKune*, 267 Kan. 797, 803-04, 987 P.2d 1073 (1999) (citing *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 619, 103 L. Ed. 2d 639, 109 S. Ct. 1402 [1989]). But, because the reasonableness of a search is not capable of precise definition or mechanical application, courts have adopted an approach which balances the government interest against the invasion of personal rights involved. *Pool*, 267 Kan. at 804.

Under a Fourth Amendment reasonableness test, the officers' decision to collect the defendant's backpack at the time of his arrest was justified under the circumstances. The backpack was within the defendant's immediate vicinity at the time of the arrest, even if the defendant had walked a few steps away from the bag. It was not unreasonable for the officers to believe the backpack constituted personal property of the defendant at the time of his arrest, which, if not collected, would be subject to loss or damage.

At the time of the defendant's arrest, the officers did not search the backpack but, in conformity with Lawrence police department policies, seized the backpack and took it with the defendant to the jail. Due to space limitations, the police then logged the defendant's excess personal items into the found property storage area in the law enforcement center. The search of the backpack was reasonable as an inventory search, and the district court properly refused to suppress the contents of the backpack as fruits of an illegal search.

## (B) Evidence Obtained from the Search of the Defendant's Residence

The defendant further challenges the use of evidence seized from the search of his residence or fruit of the search, claiming the search warrant was invalid. Assuming without deciding that the search of the defendant's residence was illegal because such was premised upon an invalid search warrant, the only objectionable evidence introduced at trial as a result of the search was four pic-

tures depicting individuals engaged in sexual bondage activities and a few entries from the defendant's personal journal related to the victim. The admission of this evidence, even if wrongful, was clearly harmless.

" 'Error in the admission or exclusion of evidence in violation of a constitutional or statutory right of a party is governed by the federal constitutional harmless error rule. An error of constitutional magnitude is serious and may not be held to be harmless unless the appellate court is willing to declare a belief that the error is harmless. Before an appellate court may declare such an error harmless, the court must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. Where the evidence of guilt is of such direct and overwhelming nature that it can be said that evidence erroneously admitted or excluded in violation of a constitutional or statutory right could not have affected the result of the trial, such admission or exclusion is harmless.' [Citation omitted.]" *State v. Hebert*, 277 Kan. 61, 96, 82 P.3d 470 (2004).

The defendant admitted he had entered the victim's residence early in the morning on February 16. He further admitted he had brought sex toys with the intention of using them with the victim. The issue before the jury was merely one of intent. The victim testified clearly about what occurred and specifically identified the defendant. The victim's account was corroborated by circumstantial evidence regarding the defendant's entry through the window.

The defendant's journal entries obtained from the defendant's computer helped to establish the State's theory of criminal intent to the extent such evidence demonstrated the obsessive nature of the defendant's relationship to the victim. However, the prejudice caused by the admission of the journal entries was significantly minimized by the amount of other evidence related to the relationship between the defendant and the victim properly admitted.

The State offered a videotape the defendant delivered to the victim in which the defendant recorded himself under his bed coverings addressing "pillow talk" to the victim. This videotape was not seized as the result of the search of the defendant's residence. Similarly, the State offered a letter from the defendant to the victim which enclosed two leather straps. The letter indicated the use for the straps in the following manner:

" 'I will be the man now and guide us through this time. You be like a woman should be in certain emergencies and take orders from your man. Sweetie, I'm not kidding. Way, way too much time has gone by already. Today, Friday the 9th, is the last day we waste. Tomorrow's the day we start our lives together. It may or may not be forever. That is up to you. But we have love and we have endless passion and it is right now. Today is the last day we waste. Tomorrow, July 10th, our new lives start. Not sort of, not partway, not halfway, but 100 frappin [*sic*] percent.

. . . .

" 'Now as the man, I'm telling you that you as the woman have been bad. I've already told you that you owe me a debt. That is what the package is for. Open it now. They go on your wrists. Try them on. Have them on tomorrow night, Saturday night, at 11 p.m. Have on something simple along with them, like a bra or T-shirt. If you have plans that overlap 11 p.m., break them. Sweetie, I brought those for two reasons. One fun and one serious. One, your bottom owes me a debt, and those are to make sure that I get to pay it without you resisting too much. Yes, I am totally serious.

" 'The second reason is much more profound. There is an absolute symbology to your acquiescence right now. By letting me be in charge and steer us through this turbulence and into tranquility, you will say to me that you know I love you with all of my heart.' "

Although the defendant claimed this letter reflected an inside joke the defendant shared with the victim, the jury heard that the victim called the police when she received this letter.

The State properly introduced photocopied pages from the victim's journal upon which the defendant had written additional comments to the victim. The State properly admitted the sex toys discovered in the defendant's backpack. The prejudice to the defendant by the admission of the bondage photographs seized from the defendant's computer was limited to removing from the jurors' imaginations the intended use of the sex toys. The defendant testified he took the bondage toys to the victim's house on February 16 because she had expressed a desire to pay her "outstanding debts."

Based upon the defendant's own admissions and the amount of evidence properly introduced to demonstrate the defendant's intent, we firmly conclude the admission of the evidence obtained from the search of the defendant's residence and/or computer was constitutionally harmless, even if the search was illegal.

## Psychological Evaluation of the Victim

The defendant further complains the district court prejudiced his defense by refusing to allow the defendant to obtain a psychological evaluation of the victim. Whether a criminal defendant is entitled to an independent psychological evaluation of a victim is left to the sound discretion of the district court. An appellate court will not disturb a district court's exercise of discretion absent a showing the district court's judgment was arbitrary, fanciful, or unreasonable, which is another way of saying abuse of discretion is found only when a district court takes a position no reasonable person in similar circumstances would have taken. *State v. Price*, 275 Kan. 78, 80, 83, 61 P.3d 676 (2003).

The right of a criminal defendant to request a victim to submit to a psychological evaluation is limited to cases in which the victim has alleged a sex crime against the defendant. See *State v. McIntosh*, 274 Kan. 939, 941-45, 58 P.3d 716 (2002). The reason for so limiting the right to a psychological evaluation of the victim is related to the nature of some sex crime cases, *i.e.*, an uncorroborated allegation of a sex crime which may have been the result of a mental condition transforming a wishful biological urge into a fantasy, or an aggressive tendency prompted by a desire for attention. *State v. Gregg*, 226 Kan. at 487.

Here, the victim did not allege the defendant committed a sex crime, even though the State sought to demonstrate, through circumstantial evidence, the defendant entered the victim's residence with the intent to commit a sexual battery. Moreover, the victim's allegations against the defendant are corroborated, albeit by circumstantial evidence. Consequently, the district court did not err in finding that *Gregg* did not permit a psychological evaluation of the victim under the circumstances of this case.

## Jury Instructions

The defendant challenges the district court's jury instructions on two bases: (1) the district court erroneously included the intent to commit a sexual battery within the jury instructions on aggravated burglary, and (2) the jury instruction regarding the bodily harm element of aggravated kidnapping was deficient and misleading.

The defendant failed to object to either of these instructions at trial.

Where a criminal defendant challenges jury instructions for the first time on appeal, this court reviews the instructions as a whole to determine whether the offending instruction is clearly erroneous. A jury instruction is clearly erroneous only when the reviewing court is convinced of a real possibility the jury would have returned a different verdict had the erroneous instruction not been given. *State v. Trotter*, 280 Kan. 800, 805, 127 P.3d 972 (2006).

## (A) Aggravated Burglary

The defendant contends the instruction on aggravated burglary included a prosecution theory that had been dismissed during the preliminary hearing, *i.e.*, sexual battery. The defendant contends that allowing the jury to consider a charge dismissed after a preliminary hearing violates due process. The defendant confuses alternate theories for an offense with evidence to support probable cause that the offense occurred.

The Fourth Amendment to the United States Constitution requires a fair and reliable probable cause determination before an individual is significantly detained for criminal prosecution. In Kansas, this probable cause determination occurs when a magistrate holds a preliminary examination or when an indictment is issued by a grand jury. *State v. Thompkins*, 263 Kan. 602, 618, 952 P.2d 1332 (1998).

During the defendant's preliminary hearing, the district court bound the defendant over for trial on all charges of the complaint, including aggravated burglary. The court noted, however, the State's evidence at the preliminary hearing did not support all of the various theories presented by the prosecution. Relying on *Thompkins*, the defendant argues the district court's finding that the State had presented insufficient evidence of sexual battery constituted a dismissal of that theory of prosecution. The defendant's argument does not bear close scrutiny.

In *State v. Young*, 277 Kan. 588, 87 P.3d 308 (2004), a criminal defendant was charged and arraigned on premeditated first-degree murder, but the district court instructed the jury on a theory of

felony murder, as a lesser included offense of premeditated first-degree murder. While noting that felony murder is not a lesser included offense of premeditated murder, our Supreme Court ruled that the instruction on felony murder was not error, plainly rejecting the reasoning employed in *Thompkins*. The *Young* court noted the evidence produced at trial clearly supported the instruction on felony murder and the prosecution did not mislead the defense in its presentation of the case. Because felony murder was merely an alternate theory of first-degree murder, the court properly instructed the jury on the alternate theory where the evidence supported the instruction. 227 Kan. 588, Syl. ¶¶ 4, 5.

Similarly, the defendant cannot demonstrate prejudice from the State's presentation of the sexual battery theory of aggravated burglary. The State consistently maintained the defendant entered the victim's residence with the intent to commit a sexual battery, and the defense merely argued his entry into the residence was authorized. Under the reasoning of *Young*, the district court committed no error in instructing the jury on the State's sexual battery theory of aggravated burglary.

### (B) Aggravated Kidnapping

The district court's jury instruction on the bodily harm element of aggravated kidnapping stated:

" 'Bodily harm' includes any act of physical violence even though no permanent injury results. Trivial or insignificant bruises or impressions resulting from the act itself should not be considered as 'bodily harm.' "

This instruction exactly follows the suggested definition provided in the notes to PIK Crim. 3d 56.25, except that the final sentence was omitted: "Unnecessary acts of violence upon the victim, and those occurring after the initial abduction would constitute 'bodily harm'." The defendant contends this omission misled and confused the jury. We conclude that, if the instruction confused the jury, the confusion prejudiced the State not the defendant.

The final sentence of the instruction given to the jury explained that trivial injuries arising out of the victim's confinement did not constitute bodily harm. The jury was not told that unnecessary acts of violence, even if inflicted during the confinement, could con-

stitute bodily harm. The jury was not told that injuries occurring after the confinement was completed could constitute bodily harm. These omissions benefit the defendant; therefore, the instruction, if erroneous, provides the defendant with no basis for relief.

### Exculpatory Evidence

After his trial, the defendant filed several motions for a new trial. One basis for a new trial was the State failed to produce exculpatory evidence. On appeal, the defendant specifically challenges the State's refusal to produce a forensic laboratory report the Kansas Bureau of Investigation (KBI) prepared in relation to a DNA analysis of scrapings from the victim's fingernails and the State's failure to disclose extant notes used to create police reports in this case.

### (A) KBI Laboratory Report

There is no legal merit to the defendant's contention he was not provided with the KBI laboratory report. While the defendant clearly made discovery requests to the State, there is no indication in the record on appeal he did not receive the laboratory report. In fact, the KBI forensic biologist was called as a defense witness. The defendant clearly knew the results of the forensic examination of the fingernail scrapings but was unable to present these results to the jury because the defendant could not establish the proper foundation for the admission of the DNA report.

### (B) Investigatory Notes of Police Officers

While the record supports the defendant's allegations that at least two police officers possessed undisclosed field notes with which their reports were prepared, the record indicates the State was completely unaware of these reports until after the trial. Consequently, before this court will order a new trial, the defendant must establish a high level of materiality of the undisclosed exculpatory evidence. See *State v. Adams*, 280 Kan. 494, 501, 124 P.3d 19 (2005).

On appeal, the defendant argues only the notes of Officer Garcia were material. Garcia's notes indicated Lucille Toback, the victim's neighbor, claimed to be awake at 5:30 a.m. on February 16 and heard no noises until 6:45 a.m. The defendant claims this testimony

was material because such would have allowed the defendant to impeach the victim's account that she had been screaming when the defendant entered her residence.

Although the statements of Toback to Garcia are material, this evidence was merely cumulative. Toback testified at trial she awoke before 5 a.m. on February 16 and never heard screaming from the victim's residence. The jury heard this testimony, which was consistent with the notes taken by Garcia, but apparently did not believe the testimony discredited the victim. We firmly conclude the unintentional failure to disclose Garcia's field notes does not constitute grounds for reversing the defendant's convictions and remanding the case for a new trial.

## Prosecutorial Misconduct

The final issue to be considered in this appeal concerns the defendant's allegations of prosecutorial misconduct. The defendant alleges the prosecutor: (1) violated the district court's orders regarding the introduction of photographs purportedly depicting the victim and the victim's residence; (2) improperly impeached a defense witness with unfounded accusations; (3) made inflammatory and prejudicial remarks in closing statements, (4) misstated evidence produced at trial; and (5) misled the jury on the law.

Although the defendant failed to object to much of this alleged misconduct, our standard of review is the same whether the alleged misconduct was preserved by a contemporaneous objection or is challenged for the first time on appeal. *State v. Gunby*, 282 Kan. 39, 63, 144 P.3d 647 (2006).

Appellate review of allegations of prosecutorial misconduct involves a two-part analysis: a performance prong and a prejudice prong. First, the court must decide whether the alleged misconduct transgressed the permissible bounds of zealous advocacy, remaining cognizant of the wide latitude permitted prosecutors to argue reasonable inferences from the evidence adduced at trial. *State v. Robertson*, 279 Kan. 291, 303, 109 P.3d 1174 (2005). If the prosecutor's conduct is found to have been improper, the court must then consider the prejudice, if any, to the defendant's ability to obtain a fair trial. Three factors should be considered in deter-

mining whether a defendant has been prejudiced by improper prosecutorial conduct:

" '(1) whether the misconduct is so gross and flagrant as to deny the accused a fair trial; (2) whether the remarks show ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors.' " *State v. Tosh*, 278 Kan. 83, 93, 91 P.3d 1204 (2004).

Having reviewed the defendant's allegations of prosecutorial misconduct in light of the entire trial record, we conclude the allegations either have no foundation in fact or had no influence upon the jury's deliberations.

Affirmed.