(212 P.3d 232)
No. 99,655

STATE OF KANSAS, *Appellee*, v. CHARLES E. SMITH, *Appellant*.

Opinion filed July 24, 2009.

*Meryl Carver-Allmond*, of Kansas Appellate Defender Office, for appellant.

*Mark A. Simpson*, assistant district attorney, *Charles E. Branson*, district attorney, and *Steve Six*, attorney general, for appellee.

Before GREENE, P.J., PIERRON and GREEN, JJ.

GREEN, J.: The issue before this court is whether the trial court abused its discretion in refusing to appoint Charles Smith new counsel. Based on the lone assertion of Smith's attorney who refused to present potentially relevant defense evidence on Smith's behalf because he believed that a suspect shown in a crime surveillance video was Smith, the trial court developed a general rule covering all attorneys who could have represented Smith, thus committing the logical fallacy known as a hasty generalization. Just because Smith's attorney believed that the suspect shown in a crime video was the defendant, it does not follow that all attorneys would have viewed that video in the same way as Smith's attorney, especially when the assertion is based on the sense of sight. More important, this generalization theorizes that all attorneys would

have refused to present potentially relevant evidence in Smith's defense. Accordingly, we reverse and remand for a new trial.

This case involves the robbery of a Lawrence convenience store. In the early morning hours of November 25, 2006, Ryan Harrold was working at the store when he went outside to smoke a cigarette. When a man came around the corner of the building, Harrold put out his cigarette, and the man held the door for him as Harrold went back inside. When Harrold turned back around from scanning the man's cigarette purchase into the register, the man was leaning over the counter, pointing something at Harrold from under his shirt. He demanded that Harrold give him all of the money in the register. Harrold assumed the man was pointing a gun at him. Harrold gave the man approximately $300 from the register. Moreover, the man stated that he did not care about the surveillance cameras because he needed money for his family. After the man left the store, Harrold pushed the panic button and called the police.

Harrold was able to get a good look at the man's face both when the man held the door for him and as he was being robbed. The convenience store's surveillance cameras also captured the robbery from various angles. From Harrold's description, the surveillance video, and still shots taken from it, the investigating officers recognized Smith as a possible suspect and began looking for him.

The investigation eventually led to the home of Stephen Edwards. Smith and his brother, Rufus Smith, were found in a bedroom.

Rufus was taken to the police station for questioning concerning a different aggravated battery investigation. At the time, Rufus was wearing black tennis shoes that were very similar to the distinctive shoes worn by the crime suspect. Rufus told police the shoes belonged to his brother (defendant Smith). Rufus told the police that he was wearing the shoes because when he went to put on his shoes, they were gone and Smith's shoes were in their place.

Smith was arrested and taken to the police station for questioning. Smith eventually admitted the shoes Rufus was wearing were his. The police also obtained Smith's palm prints for comparison

to prints taken from the convenience store. The prints did not match.

Edwards was also taken to the police station for questioning. When police showed Edwards the photos taken from the surveillance video of the crime, Edwards told police that he believed Smith was the man in the video. The police did not believe that Edwards matched the description of the suspect given by Harrold or as seen in the surveillance video.

As a result of the investigation, the State charged Smith with aggravated robbery. Harrold identified Smith at trial as the man who robbed him. Edwards denied that he was the suspect in the video and again identified Smith and the shoes that the suspect was wearing in the surveillance video. Rufus also stated that the shoes belonged to Smith and admitted that he told the police during his interview that the suspect in the photographs appeared to be his brother.

The jury found Smith guilty of robbery. The trial court sentenced Smith to a standard presumptive sentence of 57 months in prison.

*Did the Trial Court Abuse Its Discretion in Refusing to Appoint Smith New Counsel?*

In his first issue on appeal, Smith argues that the trial court should have appointed him new counsel when it was made aware of an irreconcilable conflict between Smith and his court-appointed attorney, James Rumsey.

*Standard of Review*

This court reviews the trial court's refusal to appoint Smith new counsel for an abuse of discretion. To establish an abuse of discretion, Smith must demonstrate that no reasonable person would take the view adopted by the trial court. See *State v. Bryant*, 285 Kan. 970, 986, 179 P.3d 1122 (2008).

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to effective assistance of counsel, but that right does not extend to entitle an indigent defendant to counsel of his or her choice. *State v. McCormick*, 37

Kan. App. 2d 828, 836, 159 P.3d 194, *rev. denied* 284 Kan. 949 (2007). To be entitled to the appointment of substitute counsel, Smith had to establish a "justifiable dissatisfaction" with Rumsey. Justifiable dissatisfaction includes a showing of conflict of interest, an irreconcilable conflict, or a complete breakdown in communications between the attorney and the defendant. See *Bryant*, 285 Kan. at 986.

Not all disagreements between counsel and defendants constitute irreconcilable conflicts or lead to complete breakdowns in communication:

"[U]ltimately, ' "[a]s long as the trial court has a reasonable basis for believing the attorney-client relation has not deteriorated to a point where appointed counsel can no longer give effective aid in the fair presentation of a defense, the court is justified in refusing to appoint new counsel." ' [Citations omitted]." 285 Kan. at 986-87.

*Background*

Before determining if the trial court abused its discretion in refusing to appoint Smith new counsel, the context under which he requested new counsel must be explored. A week before trial, Rumsey moved to withdraw as Smith's counsel. At Rumsey's request, the trial court conducted a hearing outside of the State's presence to allow Rumsey to explain the basis for his motion and to determine if Rumsey should be allowed to withdraw. See *Bryant*, 285 Kan. at 991 (in order to determine whether appointment of new counsel is warranted, the trial court is required to conduct some type of investigation). Rumsey told the trial court that he had viewed the surveillance video of the robbery on many occasions. Moreover, Rumsey told the court that there was no doubt in his mind that Smith was the person in the video:

"MR. RUMSEY: Okay. There is a surveillance video in this case that was taken continuously during the robbery at the Presto Convenience Store and there are several views of the face of the person that committed that robbery. I have seen it more times than I can count. *There is no doubt that it is the face of the defendant. He denies that it's his face and wants me to put on evidence that would tend to suggest that he was physically infirmed and unable to perform the robbery and that he had no motive to commit the robbery because he had a job, although he was, at the time—he had been off the job with a Workers' Compensation claim. He had received some benefits. My problem with doing that is that I would know*

*that that evidence would be false* and I have tried to explain to him in writing and orally on numerous occasions that I can't do those kinds of things, and he takes that to mean that I am refusing to represent him or can't represent him, and I have explained to him that I still have the ability to cross examine the State's witnesses and make the State prove beyond a reasonable doubt that he is guilty. *I just can't participate in putting on evidence that I know would be fraudulent.* He asked me then to file a motion to withdraw." (Emphasis added.)

Based on Rumsey's quoted statement, it is apparent that he had investigated Smith's assertions that he had suffered a work disability and that he had received workers compensation benefits and learned that both contentions were true. The following quote from Rumsey's statement illustrates this fact: "[A]*t the time—he had been off the job with a Workers' Compensation claim. He had received some benefits.*" (Emphasis added.)

After Rumsey's quoted statement indicating that he believed Smith was dishonest and was guilty, the trial judge asked Smith if Rumsey had correctly stated their differences. Smith stated as follows:

"DEFENDANT SMITH: Yes, sir. Your Honor, it is my opinion that if Mr. Rumsey feels this way, you know, I believe due process law, a person is innocent until proven guilty and he got to feel the way he wants to feel, but at the same time, I am saying that is not me, and he being my attorney, he should be able to defend me to his full capability. My concern is how would he have a closing argument, you know, if it came to that. If he is thinking I am guilty, you know, before I go to trial, what is the point of him being my lawyer? I need a lawyer that is, as I said—if I have got evidence that is in my behalf and he don't want to put that evidence on because he feels like I am already guilty, then I don't see no—."

The judge interrupted and stated:

"THE COURT: Well, Mr. Smith, no matter who I would appoint, any lawyer that the Court appoints is bound to follow rules that apply to lawyers and what evidence they can present and not present. No lawyer can present evidence that he feels is false. Knowingly making false statements to the Court can cause severe problems. Your objection would apply to any lawyer that I would appoint for you, so if that is the only reason you are seeking his removal, I am not going to approve it because he will certainly present what evidence he can in your benefit. Frequently, lawyers represent people that they feel are guilty, but that has nothing to do with whether or not the jury finds a person guilty. The burden is on the State to prove that you are guilty, so I am going to deny the motion and we will take up whether . . . we can proceed to trial."

Moreover, the State argues in its brief that although Rumsey and Smith had a conflict, it did not rise to the level of an irreconcilable conflict. The State further argues that the trial court correctly determined that any attorney appointed to represent Smith would be ethically prevented from presenting knowingly false evidence in accordance with Smith's wishes:

> "In this case, Smith's attorney was unable to produce evidence *that would exonerate Smith* because the attorney was bound by the rules of professional conduct. No attorney could present the evidence Smith wanted presented because it was false evidence. *Any attorney appointed would have to view the convenience store videotape and would necessarily see that Smith robbed the store. That knowledge would prevent all attorneys from presenting the evidence Smith wanted presented.* Since a new attorney would not resolve the problem, Smith and his attorney did not have an irreconcilable conflict." (Emphasis added.)

Here, the State does not challenge the existence of the evidence that Smith wanted to present. To the contrary, the State characterizes the evidence as *"evidence that would exonerate Smith."* (Emphasis added.) Obviously, evidence that is either untrue or contrived can not be used to exonerate a defendant.

The State, however, argues that all attorneys were ethically prohibited from presenting Smith's evidence not because the evidence was untrue, but because of their *knowledge*, which they would have garnered from their viewing of the surveillance video, that Smith had committed the robbery. Indeed, the State declared that *"[t]hat knowledge would prevent all attorneys from presenting the evidence Smith wanted presented."* (Emphasis added.)

Based on the assertion of only Rumsey who refused to present potentially relevant defense evidence because he believed that the suspect shown in the surveillance video was Smith, the trial court formulated a general rule covering all attorneys who could have represented Smith. The fallacy in this form of nondeductive reasoning is called a hasty generalization. It is drawing a conclusion from too few examples or unrepresentative instances. See generally Copi and Cohen, Introduction to Logic, pp. 146-47 (12th ed. 2005).

A hasty generalization occurs when a person creates a general rule from observing only one (or only a very few) of the members

of that class. For example, it does not logically follow that because one attorney may believe that a suspect shown in a surveillance video is the defendant that all attorneys will view the video in the same way. This is especially so when we recognize the possibility that one person's sense of sight and identification may not be as accurate as those of another, particularly a specially trained person. To argue that all attorneys would view the video in the same way is to generalize hastily. As a result, the trial court has developed a binding general rule based on too few instances.

Moreover, Smith insists that although the person in the video might bear a resemblance to him, the video is grainy and dark. He further argues that the video shows no clear shot of the suspect's face. Smith maintains that these circumstances, including the other evidence presented at trial, tended to suggest that he might not have been the suspect depicted in the video. For example, he argues that the palm prints found at the scene of the crime did not match his palm prints.

Moreover, in his defense, Smith wanted Rumsey to present evidence to suggest that Smith had a particular physical disability (unlike the person in the video) and that he was receiving workers compensation benefits, so he had no financial motive to commit the robbery. The record, however, shows that the defense did not present any evidence after the State closed its case.

The dissent counters by arguing that "the State had a strong case against Charles Smith. . . . Not surprisingly, the jury found Smith guilty." Unfortunately, the dissent's homage to the State's strong evidence against Smith causes it to minimize the main argument of Smith's appeal: that an irreconcilable conflict existed between Smith and Rumsey. If we were to adopt the dissent's reasoning, it would mean the irreconcilable conflict rule could never apply in a case where there was strong evidence against a defendant.

Moreover, the dissent crafts an excuse for Rumsey's refusal to present any evidence on Smith's behalf by contending that no evidence existed: "Rumsey refused to create evidence that was not there." To the contrary, the dissent conveniently ignores Rumsey's own statement to the trial court where he stated that "at the time—

he [Smith] had been off the job with a Workers' Compensation claim. He had received some benefits."

On the other hand, when the dissent argues that there was no evidence to support Smith's contentions, the dissent's reasoning is unacceptable because of the difficulty in sustaining a factual proposition merely by negative evidence. When an advocate determines that " 'there is no evidence that B is the case'; he or she is attempting to affirm or assume that non-B is the case. But all that is affirmed is that the advocate has found no *evidence* of non-B." Aldisert, Logic for Lawyers, p. 156 (3d ed. 1997).

Rumsey had a duty to zealously defend Smith, but Rumsey's belief that the suspect shown in the video was Smith placed Rumsey in a "no-win" situation. It prevented him from completely and zealously representing Smith. Indeed, Rumsey's lack of belief in the case may have affected his defense strategy in cross-examining the officers at trial. For example, during cross-examination, Rumsey elicited testimony concerning the officers' belief that the person shown in the surveillance videotape was the defendant. In questioning Officer Matthew McNemee about the photographs that Officer Joshua Guile had taken off of the surveillance videotape, Rumsey elicited the following testimony:

"[Rumsey:] . . . Guile had a number of photos that he had taken off the video?
"[McNemee:] Right.
"[Rumsey:] And those are the photos that you looked at and no other photos?
"[McNemee:] Yes.
"[Rumsey:] So before you looked at the photos, he is telling you, 'I got the surveillance video and got these photographs.' What else did he tell you about the robbery at Presto?
"[McNemee:] *He believed that the defendant was the suspect seen in the pictures* and that he planned to do a photo lineup with the victim from the Presto station."
(Emphasis added.)

Later, while cross-examining Officer Guile, Rumsey elicited testimony that when Officer Bronson Star saw the video, he said that the individual depicted in the video was possibly Smith. Rumsey further elicited testimony that once Smith was in custody, Officer Guile was convinced that Smith was the robber based upon what

Harrold had told him, *what he had observed on the video and the photos*, and from the identifications made from the photo lineup.

Rumsey's approach in his cross-examination strategy prevented him from keeping out damaging testimony from the officers. After Rumsey had elicited this testimony from the officers, the prosecutor elicited additional testimony concerning Officer Star's belief that the individual depicted in the videotape photographs was Smith. On redirect examination, Officer Guile testified that "at some point in time, Officer Star observed the DVD videos and indicated it was Charles Smith." Later, while examining Officer Star, the prosecutor elicited the following testimony:

"[Prosecutor:] At some point, did you look at that individual and recognize him?
"[Star:] Yes, I did.
"[Prosecutor:] And when did that occur?
"[Star:] It occurred after we cleared from the scene and went back to the Law Enforcement Center . . . . I went back to the audio/video room to meet with Officer Guile and they had printed out a series of pictures from the videotapes and I looked at the tapes and recognized the person in the photograph.
"[Prosecutor:] You recognized that person as Charles Smith?
"[Star:] Yes."

Several pages later in the trial transcript, the prosecutor again elicited testimony from Officer Star concerning his belief that Smith was the individual depicted in the videotape photographs:

"[Prosecutor:] And tell us what occurred once you viewed those photographs.
"[Star:] I looked at the clothing description, and as I was looking at the person inside — on these photographs, I recognized him as Charles Smith."

Rumsey did not object to this line of testimony.

Although Officer Star did not personally observe the person who was videotaped at the Presto Convenience Store, he was allowed to offer his opinion that Smith was the person shown in the videotape photographs. This testimony should not have been presented at trial because it invaded the province of the jury. That is because the normal experience and qualifications of lay jurors would permit them to compare the defendant sitting before them to the images shown in a videotape or photographs.

This court has previously held that a police detective should not be allowed to offer his or her opinion that a person captured on

videotape was the same person depicted in a photograph because such testimony is improper. See *State v. Hampton,* No. 91,848, unpublished opinion filed March 25, 2005, *rev. denied* 280 Kan. 987 (2005). Recognizing that such testimony invades the province of the jury, this court held as follows:

"The normal experience and qualifications of lay jurors permit them to compare the image in a videotape to the image in a photograph. No outside help was needed. Would the State object if Hampton had put on his attorney's priest or minister to opine that, after looking at the videotape and the photograph, it was the cleric's opinion the exhibits depicted two different persons? The detective's opinion was not rationally based upon his unique perception, was not necessary for the jury's clearer understanding of the testimony, and was no more material to the issue of identification than the opinion of any other layperson who might have been pulled off of the street. In short, the district court erred in permitting the detective to render his opinion that the person in the videotape and in the photograph were the same man." Slip op. at 8.

See also *State v. Graham,* 246 Kan. 78, 81-82, 785 P.2d 983 (1990) (police photographer's testimony indicating that defendant was man shown in series of mug shots and photos from scene of robbery should not have been admitted as it invaded province of jury).

In short, Rumsey was obviously correct in moving to withdraw under the circumstances because (1) he believed that Smith was being dishonest; (2) he and Smith could not agree on how the case should be defended; and (3) his belief that Smith was guilty prevented him from utilizing potentially relevant defense evidence. Under the facts of this case, we find that an irreconcilable conflict existed between Smith and his attorney. We further determine that the trial court abused its discretion in denying the defense's motion to withdraw.

Because we are reversing and remanding this matter for a new trial, we need not address Smith's other contentions of error.

Reversed and remanded for a new trial.

PIERRON, J., dissenting: I respectfully dissent. The State had a strong case against defendant Charles Smith. The robbery victim got a good look at the robber. The store's surveillance cameras also captured the robbery from various angles. From the victim's de-

scription and the surveillance shots, the investigating officers (who apparently knew Smith) believed that he was definitely a suspect.

Smith and his brother, Rufus Smith, were brought in for questioning. Rufus was wearing black tennis shoes that were similar to the distinctive shoes worn by the robber. Rufus said the shoes belonged to his brother. Smith admitted that the shoes were his.

Stephen Edwards, an acquaintance of the Smiths, whose house was where the Smiths were picked up, said he believed Charles Smith was the man in the surveillance shots. Rufus also said his brother was the man in the surveillance shots.

Not surprisingly, the jury found Smith guilty. He received the presumptive sentence of 57 months' imprisonment.

The defense by James Rumsey was to attack though cross-examination and oral argument the State's case, which was based on the five identifications of Smith by the victim, the two officers, Rufus, and Edwards, as well as the jury's ability to see the surveillance shots and compare them to defendant Smith.

Smith apparently wanted Rumsey to do more than that, although exactly what that was is not clear from the record, Smith's brief, or the majority opinion. Rumsey was doing the best he could with the evidence that actually existed. Smith and the majority appear to focus on the fact that Rumsey believed the robber was Smith because of the very strong evidence.

However, this is not a case where the defense counsel gave up and/or admitted to the jury that Smith was guilty. Rumsey continued to challenge and test the evidence as best as could be done, and he argued that most important arrow in the quiver of the defense, the obligation of the State to prove Smith's guilt beyond a reasonable doubt.

Neither Smith nor the majority state what other evidence Rumsey should have presented. There was no alibi, there was no evidence that someone else committed the crime, and there was no evidence, despite Smith's receiving workers compensation benefits, that he was physically unable to do what the robber did.

It is true that Rumsey told the court he refused to present fraudulent evidence. But, in the context of the colloquy, all he was contending was that there was no evidence of the sort that Smith, and

now the majority, demand him to produce or invent. Should this case be remanded for a new trial on this issue, the trial judge and the trial attorney would be faced with a very difficult question: What evidence must the counsel present, whether it exists or not?

A close reading of the record, Smith's brief, and the majority opinion shows no evidence that actually exists which was not presented. Rumsey refused to create evidence that was not there. However, he argued strongly in support of Smith's innocence, even though the evidence against Smith was very strong. The position of Smith and the majority is unsupported by the facts or the applicable law of this case. The trial judge, who heard the whole trial, was correct in denying Smith's demand to be supplied with an attorney who would be required to produce nonexistant or fraudulent evidence.